555 A.2d 818

COMMONWEALTH of Pennsylvania, Appellee,

v.

George EDWARDS, Jr., Appellant.

Supreme Court of Pennsylvania.

Argued Oct. 25, 1988.

Decided March 6, 1989.

Reargument Denied April 26, 1989.

Vito P. Geroulo, Scranton, for appellant.

Ernest Preate, Jr., Dist. Atty., Robert A. Graci, Chief, Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

On March 20, 1985, the appellant, George Edwards, Jr., was found guilty by a jury in Lackawanna County of Murder of the First Degree and Rape. Following the guilty verdict, a separate sentencing hearing was held pursuant to the Sentencing Code, 42 Pa.C.S.A. § 9711 and the jury unanimously returned a sentence of death. Post trial motions filed by the appellant were denied by the trial court. The case is now before us on automatic appeal pursuant to 42 Pa.C.S.A. § 9711(h).

### I.

In appellant's first argument he raises the issue of the sufficiency of the evidence. He contends that the evidence was insufficient to support a verdict of first degree murder.

The evidence produced at trial established the following: On June 9, 1984, a hot, summer-like, late spring day, the appellant and the victim, Debbie Prislupsky, were together at Rosencrans Landing at Lake Henry, a vacation and recreation area in Lackawanna County where seasonal residents maintain campers and trailers as summer homes. During the early afternoon, the appellant and the victim were observed relaxing at lakeside listening to the radio and alternately swimming and sitting in the sun. Later that afternoon the appellant and the victim left the immediate lakefront area and walked approximately two miles over rural roads to a country tavern known as Phillips Manor. They arrived there sometime between 4:45 p.m. and 5:00 p.m. There was no evidence that either had anything to

drink prior to going to Phillips Manor.[1] Both were sober when they arrived.

When the appellant and the victim entered the tavern they went to the bar and ordered drinks. The appellant ordered a shot of whiskey and a beer; the victim ordered a rum and coke. The pair struck up a conversation with other patrons at the bar. Later, the victim started into a game of shuffleboard with some of those other patrons. Sometime later the appellant ordered five quarts of beer to take out. The bartender filled the order, putting the bottles in a paper bag. The bag of beer sat on the bar while the appellant continued conversing with others and the victim continued to play the shuffleboard game. After the appellant and the victim had been in the tavern for an hour or so they became loud and boisterous, using profanities and vulgarities in their conversations. The bartender, judging that the victim had become intoxicated, refused to serve her any more alcoholic drinks. He did continue to serve the appellant who began to order double shots of whiskey. Although the double shots were ordered by and served to the appellant, the victim drank most of them.[2] The victim, who was now intoxicated, took the bag of beer from the bar and went outside. A short time later the appellant learned that the victim, either intentionally or accidentally, dropped the bag in the parking lot breaking all of the bottles of beer. This angered the appellant and he stated "I'm going to f___in' kill her." "All f___in' broads need to be put in their place." (N.T. 3/14/85, p. 12.) The appellant then

1. Marsha Greenfield, a lakefront neighbor of the appellant and victim testified that she observed them at lakeside most of the afternoon and neither of them had anything to drink. At one time during the day, Debbie Prislupsky approached George Greenfield, Marsha's husband, and asked him to drive her to a place where she could buy a case of beer. Mr. Greenfield refused her request. It was some time later that the appellant and victim left for Phillips Manor.

2. Frances Tucker, a patron at Phillips Tavern who was sitting near the appellant testified that she observed the bartender serve the appellant two double shots of whiskey and saw the victim, Debbie Prislupsky, drink them. (N.T. March 13, 1985, p. 226.) The bartender, Joseph Dzwieleski, testified that he served the appellant three double shots and saw him drink one or two of them (N.T. March 13, 1985, p. 115.)

ordered five more quarts of beer which were placed in another paper bag. The appellant kept this bag beside him at the bar. The victim re-entered the tavern and returned to the bar near the appellant. She and the appellant continued their loud and boisterous conduct, annoying and causing some concern to the others in the tavern. After an unpleasant exchange of words with another tavern patron, the appellant picked up the bag from the bar and he and the victim began to leave. On their way out the appellant banged the victim into the door and door jamb as they proceeded to the outside. Once in the parking lot the victim fell to the ground a couple of times and while she was down the appellant kicked her in her side and rib cage. He pulled her up by the arm and dragged her a distance in the lot. The victim was then knocked to the ground once again, this time she fell with such force that she banged the back of her head on the ground. The appellant pulled her up only to have her go crashing to the ground once again. This time the bandanna she was wearing came off her head and the appellant picked it up and tied it around his head. The appellant picked her up once more and she was staggering as she and the appellant proceeded into the woods. It was sometime between 6:30 p.m. and 6:45 p.m. that the appellant and the victim had left the tavern and disappeared into the woods. Shortly thereafter, fearing that they might return, the bartender called the police. He asked that a police officer stop by the tavern because he feared that the appellant would return and cause trouble.[3]

At approximately 7:15 p.m., Jefferson Township police officer Gary Pozza, responding to the call, arrived in the Phillips Manor parking lot. He noticed nothing unusual or out of the ordinary upon his arrival. He went into the tavern and learned that the reason why the police were called was because of the boisterous and menacing conduct

3. When the bartender refused to serve the victim any more alcohol, the appellant became angry and remarked, "My f...in' arm is bigger than his neck, I could choke him." (N.T. March 13, p. 221.) The bartender felt threatened by appellant's remark. Appellant was a large, powerfully built man who bragged that he could press over 600 pounds.

of the appellant who had left a short time earlier. Officer Pozza was told by some of the patrons that they believed the appellant and the victim were still in the area. He was informed that they had gone into the woods next to the parking lot. Three patrons of the tavern, Florence Healey, Joyce Davis and Bill Davis went outside with officer Pozza to show him where the appellant and the victim had gone. Florence Healey proceeded into the woods with Joyce Davis lagging behind her. She went in at the same place that the appellant and the victim had entered. A short piece into the woods she observed the appellant with his pants down, kneeling on his hands and knees. She could see his bare back and behind. She could not see the victim. She immediately retreated from the woods and said to the police officers that it appeared that the parties were in there having sex.

Officer Pozza went into the woods and he observed the appellant in a semi-crouched position in a ravine right next to the victim who was partially nude and lying by a stream. The victim's panties were pulled down to her ankles and her top was pulled up so that her breasts were exposed. From his angle of view he could not see her face but he did observe that she had blood on her legs. The appellant had blood on his shirt and about his face, beard and forehead. Officer Pozza was accompanied into the woods by officer Petronchak of the Archbald Borough Police Department. The two officers working together were able to get the appellant to come up out of the ravine. Appellant had some difficulty negotiating the steep slope with an open quart bottle of beer in his hand. When he reached the top, officer Pozza kicked the bottle out of his hand and the appellant was made to lie on the ground. At this point he was cuffed with his arms behind his back. Without anyone asking him a question, the appellant blurted out: "I didn't do anything" and "She's okay." (N.T. March 12, 1985, pp. 18, 19.)

Officer Pozza then went down into the ravine to check on the victim and discovered that she was dead. The victim had been beaten savagely; her face was a flattened mass of

blood, wounds, tears, bruises and broken bones. Subsequent examination revealed that there were seven major fractures and numerous tiny fractures of the victim's face. The rest of her body was marked by at least thirty-five human bite wounds. The victim had been bitten on her chest, breasts, stomach, thighs, pelvis, arms and hands. The bite marks were vicious, deep and penetrating. The bites on her breasts were so deep and cruel that the nipple on her right breast was almost completely removed and the nipple on the left breast was severely lacerated. There were other circular marks in the same general areas of her body which were incomplete and thus could not be identified as human bites. Many of the bites showed bruising around them and bleeding indicating they were inflicted while the victim was still alive. Also many of them showed-slippage or blurring at one edge indicating that the victim was moving when the bite was inflicted. The bites on the victim's arms and hands were defensive wounds indicating that she was trying to defend herself from the merciless attack. Additionally, there were tears and bruises on the victim's vagina. The cause of death was traumatic strangulation with significant conditions being facial and skull fractures, and numerous contusions, abrasions and lacerations. The strangulation was accomplished by a metal choker twisted around her neck with such force that the hyoid bone, which lays on top of the voice box, was fractured. There was considerable bruising and bleeding that extended all the way back to her spinal column. Dr. Thomas DiSilvo, the pathologist who performed the autopsy testified that there was no place on the victim's face that was unmarked by injury. The blows to the face were not random blows. They had a pattern to them so as to systematically cover every area of her face. Further, Dr. DiSilvio testified that considerable force is required to break facial bones as the victim's were broken in this case. The bites, like the blows to her face, were not random bites. Except for the defensive wounds, the bites were systematically inflicted in sexual areas of the victim's body.

In reviewing for the sufficiency of the evidence the test is that:

"[w]e view the evidence in the light most favorable to the Commonwealth and, drawing all reasonable inferences therefrom favorable to the Commonwealth, determine if there is sufficient evidence to enable the trier of fact to find every element of the crime beyond a reasonable doubt."

*Commonwealth v. Stoyko*, 504 Pa. 455, 462, 475 A.2d 714, 718 (1984). Considering all of the evidence of record, including the foregoing, and applying the applicable standard of review for sufficiency, we have no hesitation in finding that the evidence was sufficient beyond a reasonable doubt to sustain the jury's verdict of guilty of murder of the first degree.

## II.

The appellant argues that the evidence failed to establish that the victim, Debbie Prislupsky, had been raped. He contends there was no direct evidence of penetration. He argues that under the relevant statute, without penetration there is no sexual intercourse and therefore, no rape. *See* 18 Pa.C.S.A. § 3101 and 18 Pa.C.S.A. § 3121.

Sam Marusco and Eugene O'Malley were inmates at Lackawanna County Jail awaiting trial when the appellant was incarcerated there. Marusco testified that he and O'Malley were in O'Malley's cell one evening playing cards when the appellant paid them a visit. A conversation developed among the three prisoners during which the appellant seemed to boast about his responsibility for the death of Debbie Prislupsky. Appellant admitted that, against her will, he dragged the victim into the woods, lowered her panties to her ankles, took one of her legs out of her panties and forcibly started to have sexual intercourse with her. Further, appellant stated that when he was unable to reach a climax and get satisfied he started to punch and bite the victim—biting her on her breasts, stomach, legs and pubic area. Appellant laughed as he said that

he thought he may have bitten one of her nipples off. He said the victim deserved to die because she couldn't get him to reach a climax. Appellant stated that while he was forcibly having sex with the victim, she was resisting and trying to scratch him. He said that he was lucky that the victim had a habit of biting her fingernails, otherwise he would have scratch marks all over his body.

O'Malley essentially corroborated Marusco's testimony and added that he had a separate conversation with appellant, not in the presence of Marusco. In that discussion the appellant admitted to O'Malley that he killed Debbie Prislupsky by choking her with a choker chain.

Also giving testimony was Lynn Flannery, a former girlfriend of the appellant who visited him at Fairview State Hospital after his arrest. She testified that appellant told her that the victim wanted to sit in the woods and look at and listen to the running water, but he wanted to have sex. (N.T. March 15, 1985, p. 159.) Ms. Flannery further testified that appellant told her that when the victim refused to have sex with him, he beat her and forced himself inside the victim. (N.T. March 15, 1985, pp. 159, 160.)

▪ Appellant argues that since there was no direct evidence of sexual intercourse with the victim, the alleged admissions of the appellant were inadmissible under the rule that a criminal conviction may not be based on the extra-judicial admission of the accused unless corroborated by independent evidence establishing the *corpus delicti*. *Commonwealth v. Ware*, 459 Pa. 334, 329 A.2d 258 (1974). The appellant is correct that a case may not go to a jury merely on the out-of-court confession of the accused where there is no independent evidence of a crime. That, however, is not the case here.

▪ Before introducing an extra-judicial admission, the Commonwealth is not required to prove the existence of a crime beyond a reasonable doubt. *Commonwealth v. Byrd*, 490 Pa. 544, 417 A.2d 173 (1980).

"The corpus delicti, like other facts, may be shown by circumstantial evidence; it is sufficient if these circumstances are consistent with crime even though they are also consistent with suicide or *accident;* if it were otherwise it would be impossible in many cases, where there were no eye witnesses, to convict a criminal: [citing cases]." (Emphasis in original.)

*Commonwealth v. Boykin*, 450 Pa. 25, 29, 298 A.2d 258, 261 (1982).

■ Officer Pozza testified that when he found the victim she was lying on her back with her clothes in complete disarray. Her pants and panties were down around her ankles and her blouse was lifted up. Her breasts and private parts were exposed. Officer Petronachak, who was with Officer Pozza, gave a similar description of the victim.

Dr. Thomas DiSilvio, the pathologist who performed the autopsy on the victim testified that she had been assaulted in a sexual way. He stated that the bite marks on the victim's breasts, stomach, thighs and pubic area were indicative of a sexual attack. Further, there were tears in the front entrance and back entrance of the victim's vagina. Also there was bruising around the tears which were caused by a hard, blunt object the size and shape of a man's erect penis. Dr. DiSilvio testified that the tears in the victim's vagina were of the kind and nature associated with rape. Additionally, Florence Healey, who was on the scene at the time, testified that when she went into the woods she observed the appellant on his hands and knees, naked from the waist down. He was kneeling right at the spot where the victim was found minutes later.

We conclude there was sufficient independent evidence of rape to admit the incriminating out of court statements of the appellant. Those statements along with the evidence of record recited above were sufficient to sustain appellant's conviction of rape.

### III.

■ The appellant next argues generally that the verdict of murder of the first degree is against the weight of the

evidence notwithstanding the sufficiency of the evidence. The appellant argues that the testimony offered by the Commonwealth that appellant was not intoxicated to such a degree so as to affect his ability to form a specific intent to kill is not supported by the entire record when we look at appellant's conduct at the crime scene and after his arrest and removal. We find that the appellant's argument is without merit.

As the Commonwealth points out in its brief, several police officers testified as to the appellant's conduct and behavior on the night of his arrest. Each of them gave evidence that the appellant was alert and able to understand and follow instructions. When the appellant was asked a question he responded with an appropriate answer. He recognized some of the officers at the scene and was fully aware of his surroundings. Except for his stumbling while climbing up a steep enbankment, the appellant otherwise was able to walk without difficulty. Chief James Phillips of the Jefferson Township Police Department testified that the appellant did not, "manifest anything that would render him intoxicated to a level that he was incapable of safe driving, or not being able to make a rational decision, or anything of that nature." (N.T. March 13, 1985, p. 212.) Further, there was testimony from the bartender at Phillips Manor and some of the patrons who were sitting near the appellant that the amount of alcohol appellant was served and drank was no more than 3 or 4 shots of whiskey and one or two beers.

The credibility of the witnesses is within the province of the jury.

"We have often stated that it is the function of the factfinder to pass upon the credibility of witnesses and the weight accorded to the evidence. The factfinder is free to believe all, part or none of the evidence." (Citations omitted.)

*Commonwealth v. Duncan*, 473 Pa. 62, 373 A.2d 1051 (1977). Accord: *Commonwealth v. Pitts*, 486 Pa. 212, 404 A.2d 1305 (1979). The evidence in this case was clearly

sufficient to enable the jury to conclude that the appellant was not so intoxicated so as to affect his ability to form a specific intent to kill. We find no reason to disturb the jury's verdict.

## IV.

■ The appellant argues generally that the trial court, in "death qualifying" the jury, erred by excluding for cause certain potential jurors who expressed reservations against imposing the death penalty. The appellant fails to specifically identify any of the potential jurors who, as he claims, were unlawfully excluded. Appellant argues that the "death qualifying" process resulted in the court empanelling an unfair and prosecution-prone jury. Citing *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the appellant contends that a potential juror may be excused for cause because of his or her views regarding capital punishment only if it is unmistakably clear that: (1) the juror would automatically vote against capital punishment without regard to the law and the evidence, or (2) the juror would be prevented from deciding the accused's guilt or innocence fairly and impartially. Appellant's brief, pp. 14–15.

We disagree with appellant's assertion regarding applicable law. In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) the U.S. Supreme Court clarified its decision in *Witherspoon* and held that the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment, "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 424, 105 S.Ct. at 852, 852, 83 L.Ed.2d at 851, 852. Further, the U.S. Supreme Court has held that: "[T]he "Constitution does not prohibit the states from 'death qualifying' jurors in capital cases." *Lockhart v. McCree*, 476 U.S. 162, 173, 106 S.Ct. 1758, 1764, 90 L.Ed.2d 137, 147 (1986). We have held that the Pennsylvania Constitution extends no greater rights to an accused in capital cases in this regard than is

required by the Federal Constitution. *Commonwealth v. Sneed,* 514 Pa. 597, 526 A.2d 749 (1987).

Our review of over 1790 pages of transcript of the voir dire proceedings reveals the questioning of 121 veniremen of which eleven were excused after expressing reservations regarding the death penalty. Each of the eleven who were excused indicated that he or she could not follow the law and impose the death penalty under any circumstances. Because of their expressed inability to impose the death penalty, it is apparent that each of those potential juror's views on capital punishment would prevent or substantially impair the performance of each's duties as a juror. We find that the exclusions made in this case were proper.

## V.

Next, the appellant argues that the trial court erred in denying appellant's motion to suppress all oral statements made by appellant on the night of his arrest.[4] Appellant asserts that the statements should have been suppressed because he did not make a knowing and intelligent waiver of his *Miranda*[5] rights. The basic contention of the appellant is that he was so intoxicated at the time of his arrest that he was unable to validly waive his constitutional rights.

4. Along with various remarks and responses to specific questions he made to the police officers at the scene of the crime, the appellant gave a verbal statement to State Trooper Walter Carlson. The appellant told Trooper Carlson that he (the appellant) and the victim (Debbie Prislupsky) were together all day. That later in the afternoon, he and the victim walked to Phillips Manor Tavern for a couple of beers. He said that only the victim had money. He told Trooper Carlson that at the tavern he had a beer and a couple of shots. He stated that after a while the victim wanted to leave. They ordered five quarts of beer to go. Appellant said that they went into the parking lot where the victim dropped the beer breaking some of the bottles. He stated that he slapped her in the mouth because she broke one of God's golden commandments: "If you spill or break beer, you won't go to heaven." Appellant stated that they were near an embankment and he smacked the victim in the mouth with his fist, knocking her ass over backwards down the embankment. He said that shortly thereafter he was arrested. (N.T. March 15, 1985, pp. 181–82.)

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The suppression court, which hears the testimony, must decide whether the Commonwealth has established by a preponderance of the evidence that the statements of the accused were voluntary and the waiver of his constitutional rights was knowing and intelligent. *Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976). "[T]he determination as to whether a knowing, voluntary and intelligent waiver was effected is to be made by viewing the totality of the circumstances." *Commonwealth v. Chacko*, 500 Pa. 571, 583, 459 A.2d 311, 317 (1983).

Our responsibility on review is "to determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings." *Commonwealth v. Goodwin*, supra 460 Pa. [516] at 521, 333 A.2d [892] at 895 [ (1975) ]; *see Commonwealth v. Bundy*, 458 Pa. 240, 328 A.2d 517 (1974). In making this determination, this Court will consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. *See Culombe v. Connecticut*, supra 367 U.S. [568] at 604, 81 S.Ct. [1860] at 1878 [6 L.Ed.2d 1037 (1961) ]; *Commonwealth v. Goodwin*, supra 460 Pa. at 521, 333 A.2d at 895; *Commonwealth ex rel. Butler v. Rundle*, supra 429 Pa. [141] at 149–50, 239 A.2d [426] at 430 [ (1968) ].

*Commonwealth v. Kichline, supra*, 468 Pa. at 280–81, 361 A.2d at 290.

The evidence produced at the suppression hearing established that, on the night of his arrest, the appellant was given his *Miranda* warnings on four separate occasions. Initially, Officer Gary Pozza read the *Miranda* warnings to appellant when he placed him in a police car at the scene. A short time later Chief James Phillips gave the appellant *Miranda* warnings while the appellant was seated in a police vehicle. Still later, *Miranda* warnings were given to the appellant by State Trooper Walter P. Carlson—once at the crime scene and again at the State Police Barracks. On

each of the four occasions, the appellant indicated that he understood his rights. Further, the testimony indicated that although the appellant had been drinking immediately prior to the killing, he nonetheless was alert, fully aware of his surroundings, able to follow instructions, walked in a normal fashion and was otherwise in command of himself. When Chief Phillips asked appellant for the victim's name, appellant correctly answered that she was Debbie Prislupsky. When Chief Phillips incorrectly spelled the victim's last name, the appellant immediately gave him the correct spelling.[6] Additionally, appellant gave Chief Phillips the correct name and address of the victim's father.

Some time much later at the police barracks after he described his activities with the victim that day and was told he was being charged with murder, the appellant asked Trooper Carlson to call attorney Cosmos Mustacchio of the Lackawanna County Public Defenders Office for him. As soon as appellant requested attorney Mustacchio, all conversation with him ceased and no further statements were elicited from appellant.

The fact that the appellant had been drinking before his arrest does not automatically render his statements inadmissible.

> "The test is whether he had sufficient mental capacity at the time of [his making the statements] to know what he was saying and to have voluntarily intended to say it. Recent imbibing or the existence of a hangover does not make his [statements] inadmissible, but goes only to the weight to be accorded to [them]. (Citations omitted.)

*Commonwealth v. Smith*, 447 Pa. 457, 460, 291 A.2d 103, 104 (1972).

The suppression court's conclusion that appellant's oral statements were voluntary and entirely admissible is supported by the record.

**6.** Chief Phillips spelled the victim's name as P-r-i-s-l-i-p-s-k-i. The appellant said to him: "No, you dumb f\_\_er, its P-r-i-s-l-u-p-s-k-y." (N.T. March 13, 1985, p. 186.)

## VI.

■ Appellant contends that the trial court erred in admitting in evidence thirteen close-up photographs of the victim's body, twelve in color and one in black and white. Appellant asserts that the photos were extremely gruesome and inflammatory and should not have been received into evidence. We have held that photographs of a deceased victim are not inflammatory per se. *Commonwealth v. Petrakovich*, 459 Pa. 511, 329 A.2d 844 (1974).

> The admission into evidence of photographs depicting the corpse of the homicide victim or the location and scene of the crime lies within the sound discretion of the trial judge.... A photograph which is judged not inflammatory is admissible if "it is relevant and can assist the jury in understanding the facts."
>
> ... A gruesome or potentially inflammatory photograph is admissible if it is of "such essential evidentiary value that [its] need clearly outweighs the likelihood of inflaming the minds and passions of the jurors." (Citations omitted.)

*Commonwealth v. Garcia*, 505 Pa. 304, 313, 479 A.2d 473, 478 (1984). In this case the Commonwealth had over 100 photographs of the victim's body and of the crime scene. The trial court admitted thirteen photographs of the victim's body. The one black and white photo was of the victim's face and it showed the severity of the beating sustained by the victim. This photograph was relevant to the specific intent to kill. The other photos depicted the strangulation area of the victim's neck; the victim's fingers and hands showing defensive wounds; the left arm and forearm, the left leg and the right leg all showing bite marks that were matched to the appellant's bite and teeth; the victim's chest and abdomen area depicting the sexual nature of the attack. The photographs admitted were not inflammatory and were relevant in aiding the jury to understand the events of the crime charged.

> "A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted

are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor." *Commonwealth v. McCutchen*, 499 Pa. 597, 454 A.2d 547, 549 (1982). We find no error in the admission of the photographs in this case.

## VII.

The appellant complains that the trial court erred in permitting the Commonwealth to call Dr. John Hume and Dr. J. Edward Olivier to testify in rebuttal on appellant's specific intent to kill. We find no merit in appellant's argument.

In his defense the appellant called Dr. Edward C. Brennan, clinical psychologist, who was qualified as an expert. Dr. Brennan testified that in his opinion the appellant was severely intoxicated when he left Phillips Manor tavern with Debbie Prislupsky on June 9, 1984. Further, he testified that, based upon his review of appellant's psychiatric and psychological records and the amount of alcohol appellant said he drank on that night in question, it was his opinion that the appellant could not have formed a specific intent to kill the victim.[7]

At the conclusion of appellant's case in defense, the Commonwealth called two psychiatrists, Dr. Hume and Dr. Olivier to testify in rebuttal to the testimony given by appellant's witness, Dr. Brennan. Dr. Hume testified that in his opinion the appellant was not intoxicated to the extent

7. Dr. Brennan testified that the appellant told him that he, appellant, drank twelve to fourteen shots of whiskey, two or three beers and ingested a quantity of the drug mescaline. (N.T. March 18, 1985, pp. 128, 129, 130.) He further testified that according to the report of Dr. Olivier who examined the appellant at Fairview State Hospital, which report Dr. Brennan had in his file, the appellant stated that he drank fourteen double shots of Old Grand Dad Whiskey, each double shot consisting of three ounces of liquor. Additionally, appellant said that he had fifteen or sixteen glasses of beer along with the double shots.

that he was unable to reflect and know what he was doing on the evening in question. He testified that the evidence suggests that the appellant had control and understanding of his action at the time of the incident.

Dr. Olivier testified that the drinking activities described by the appellant, and contained in Dr. Brennan's file and testimony was totally incompatible with the truth in that the amount of alcohol he reported as consuming in a two and one-half hour period (fourteen three-ounce shots of whiskey and fifteen to sixteen glasses of beer, or, twelve to fourteen shots and two or three beers) would have left him visibly drunk, in a stupor, unconscious, or even dead. He would have been unable to walk out of the tavern. Dr. Olivier further testified that based upon the information given to him, it was his opinion that the appellant was not so intoxicated as to be unable to form a specific intent to kill.

The appellant argues that a specific intent to kill is an element of the offense of first degree murder and is required to be established by the prosecution in its case in chief. Appellant contends that it was error to allow this evidence in rebuttal. We disagree.

"Evidence is admissible in rebuttal to contradict that offered by a defendant or his witnesses, even though by doing so the Commonwealth supplies previous omissions from its case in chief ... We have previously stated that the order of presentation of evidence is a matter of sound discretion for the trial court." (Citations omitted.)

*Commonwealth v. Mangini,* 478 Pa. 147, 161, 386 A.2d 482, 489 (1978). We find no error in the court's admission of the Commonwealth's rebuttal evidence.

## VIII.

Next, the appellant argues that the trial court erred in denying appellant's request for a charge based upon the case of *Commonwealth v. Weinstein,* 499 Pa. 106, 451 A.2d 1344 (1982). The appellant argues that a basic issue in this case was appellant's ability to comprehend the nature of his

actions because of his intoxicated state. He contends that the trial court's failure to charge the jury on this important point, as requested, denied appellant a fair trial. In *Weinstein*, we said:

> At trial for murder generally, the Commonwealth must establish (1) that a human being has unlawfully been killed, (2) that the person accused did the killing, (3) that the accused is of sound memory and discretion, knows right from wrong and appreciates the nature and quality of his act, i.e., sane under Pennsylvania's M'Naghten standard, and (4) that the killing was done with malice aforethought. Malice aforethought is the general intent prerequisite to a finding of murder. It distinguishes murder from any other type of homicide and includes cruelty, recklessness of consequences and a mind regardless of social duty.

*Id.*, 499 Pa. at 115, 451 A.2d at 1348. In the instant cases the trial court instructed the jury as follows:

> A killing is with malice and is therefore murder if the killer acted with one of the following states of mind: An intent to kill or an intent to inflict serious bodily harm or a wickedness of disposition, a hardness of heart, cruelty, reckless of consequence in a mind regardless of social doing. Indicated an unjustified disregard for the probability of death or great bodily harm and extreme indifference to the value of human life.

> \* \* \* \* \* \*

> You may find the Defendant guilty of first degree murder if you are satisfied that the following four elements have been proven beyond a reasonable doubt.

> First, that Debbie Prislupsky is dead. Second, that the Defendant killed her. Third, that the killing was with specific intent to kill. And fourth, that the killing was with malice. They are the four elements of First Degree Murder.

> A killing is with specific intent to kill if it is wilful, deliberate, and premeditated. That is, if it is committed by a person who has a fully formed intent to kill and who

is conscious of his own intent. As my earlier definition of malice in the case, a killing is with malice if it is with specific intent to kill without any lawful justification or excuse or any circumstances reducing the killing to voluntary manslaughter.

You will note that although a Defendant must premeditate in order to have a specific intent to kill, premeditation does not require planning or previous thought. Premeditation can be very brief. All that is necessary is that there be time enough so that the Defendant had a fully formed intent to kill the victim and is conscious of that intention.

* * * * * *

So those are the four elements of first degree murder. Now in line with the specific intent to kill, as I have told you, the intentional killing required for first degree murder is wilful, deliberate and premeditated killing. The killer must make a conscious decision to kill and must have a fully formed intent to kill.

In determining whether or not the Defendant committed the kind of intentional killing required for first degree murder, you should consider the testimony of expert witnesses as well as all the other evidence which may shed a light on what was going on in the Defendant's mind at the time of the alleged killing.

Now, since we have heard much testimony concerning drinking in this case and whether or not some people were intoxicated and how, to what degree they were intoxicated, I'm going to give you a charge concerning voluntary intoxication.

We caution you and tell you the general rule is that voluntary intoxication is not a defense to a criminal charge. Generally speaking, a person who voluntarily uses intoxicants cannot become so drunk or intoxicated that he is for that reason legally incapable of committing a crime.

The general rule, however, is subject to a qualification when the crime charged is first degree murder. The

Defendant is permitted to claim as a defense that he was so drunk or intoxicated at the time of the killing or drugged, since there was some evidence concerning that in this case, that he did not possess the specific intent to kill required for first degree murder.

The Commonwealth had the burden of disproving this defense. Thus, you cannot find the Defendant guilty of first degree murder unless you are satisfied beyond a reasonable doubt that the Defendant was not so intoxicated or drugged at the time that he was incapable of judging his acts and their consequences or incapable of forming a wilful, deliberate and premeditated design to kill.

Considering the court's charge as a whole as we are required to do, *Commonwealth v. Woodward*, 483 Pa. 1, 394 A.2d 508 (1978), we find that the court adequately and accurately covered the points requested by appellant.

## IX.

Next, the appellant argues that his sentence of death should be reduced to life imprisonment because the trial court erred in its reply to the jury's question as to whether a person who was sentenced to a life term could be paroled.

During its deliberations the jury, inter alia, posed to the court the following question:

"Does the jury have the option to condition their verdict of life in prison to include no parole?"

The court responded to that question as follows:

"I would answer that no. As in every sentences imposed by the court, if the court imposes a sentence on someone they can give him a sentence, whatever the sentence is, they can give him, if you recall, a minimum, and the prisoner must serve that minimum—he can't serve less than that—but its up to the Parole Board. Its up to the law when he is eligible for parole, and its up to the Parole Board whether he would ever be granted parole. Just because someone is eligible for parole does

not mean they receive parole. I think if you've been reading accounts of different people who have come up for parole, you will see whether they have been granted parole or not, depending on what the conditions are."

Later, after a side bar conference with defense counsel and the prosecutor, the court further instructed the jury as follows:

"I want to correct one statement I made to you initially concerning the parole. I want to caution you that it is not the Parole Board really that can commute a life sentence, only the governor can commute a life sentence. He's the only one who can, in other words, parole someone."

"The other instruction we have for you is that you should not even be concerned with whether or not a defendant can be paroled or not because under the instruction that has nothing to do with the case. In other words, your only determination is whether or not there has been aggravating circumstances proven beyond a reasonable doubt, and whether or not there are mitigating circumstances that were proved by a preponderance of the evidence."

"Again, according to the instructions, if you found there was only one aggravating circumstance, and no mitigating circumstance, well, in that event, of course, you would, under the instructions, come back with the death sentence. If you found that there was more than one aggravating circumstance, or even one aggravating circumstance, and, nevertheless, you did find that there were mitigating circumstances and that these mitigating circumstances outweighed, in your mind, the aggravating circumstances, of course, then, you would come back with a life sentence. You would have to find that the aggravating circumstances were proved to you beyond a reasonable doubt, and that they outweigh, in your judgment any mitigating circumstances, before you could impose the death penalty, so, really, whether or not parole is granted, or can be granted, you should not even concern

yourselves with that because, under the instructions, that has nothing to do with your deliberations, but since I did make the statement before, I want to correct that, that the Parole Board does not themselves grant a life sentence, only the governor himself can commute that."

The appellant argues that the trial judge's initial response to the jury's question concerning parole was fundamentally erroneous and so clearly prejudiced as to warrant a directed verdict of life imprisonment. The appellant contends that the court's attempt to correct its error could not undo the prejudice caused by the initial reply.

We agree that in its initial response the trial court erroneously attempted to provide a factual answer to the jury's question concerning parole. First the court responded that the jury does not have the option to condition a life sentence to include no parole. But then the court went further and attempted to explain who does have responsibility for parole. By making this response, the court deviated from the standard we have prescribed when such a question is raised by a jury. We have held that the reply of the court to such an inquiry by a jury, "should be, in substance, that whether the defendant might at any future time be pardoned or have his sentence commuted is no concern of theirs and should not enter in any manner whatsoever into their consideration of the proper penalty to be imposed, which should be determined solely in light of the relevant facts and circumstances as then existed." *Commonwealth v. Johnson*, 368 Pa. 139, 148, 81 A.2d 569, 573 (1951).

Although the initial response of the trial court was in error, the court, shortly thereafter, gave curative instructions and properly charged the jury by telling them: "[Y]ou should not even be concerned with whether or not a defendant can be paroled because under the instruction that has nothing to do with the case. In other words your only determination is whether or not there has been aggravating circumstances proven beyond a reasonable doubt, and whether or not there was mitigating circumstances that were proved by a preponderance of the evidence." (N.T.

Penalty Hearing, March 22, 1985, p. 120.) We find that the court's curative instructions were adequate and there is no reason to disturb the jury's sentence of death.

## X.

██ The appellant argues that the imposition of the death penalty is contrary to the standards of social decency and violates both the federal and state constitutional prohibition against cruel and unusual punishment. The appellant cites the familiar phrase of Chief Justice Warren: "[T]he [eighth] amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976), quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). (Plurality opinion.)

In *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982) *cert. denied* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), we said:

We believe that the most accurate indicators of those 'evolving standards of decency' are the enactments of the elected representatives of the people in the legislature. What was stated earlier bears repeating at this juncture: 'In considering such an emotionally charged, controversial and polarizing issue such as the death penalty, the legislature is peculiarly well-adapted to respond to the consensus of the people of this Commonwealth.' *Commonwealth v. Story, supra* 497 Pa. [273] at 297, 440 A.2d [488] at 500 (1981) (Larsen, J., dissenting). '[T]he constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards. '[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people.' *Gregg v. Georgia, supra* 428 U.S. at 175–76, 96 S.Ct. at 2926–2927, *quoting Furman v. Georgia, supra,* 408 U.S. [238] at 383, 92 S.Ct. [2726] at 2800 [33 L.Ed.2d 346 (1972) ].

The General Assembly of this Commonwealth has, since its inception, consistently and continually expressed its conviction that the death penalty is, for at least some intentional killings, an appropriate and necessary form of punishment.

\* \* \* \* \* \*

Moreover, the legislatures of 34 other states have also concluded that capital punishment is appropriate for at least some crimes that result in the death of another person. Combining present acceptance with past usage, *Trop v. Dulles, supra* 356 U.S. at 99, 78 S.Ct. at 597, opined 'the death penalty has been observed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty.'

The finding that the death penalty is not *per se* 'cruel punishment' under Article I, § 13 is implicit in many of our prior decisions. *See, e.g., Commonwealth v. Green,* 396 Pa. 137, 151 A.2d 241 (1959) (death penalty not cruel and unusual punishment under either state or federal constitutions simply because applied to 15 year old defendant, although sentence reduced because lower court failed to consider particularized factors relating to the individual, *not* 'from a disinclination against capital punishment') and *Commonwealth v. Howard,* 426 Pa. 305, 231 A.2d 860 (1967) (death penalty not cruel and unusual punishment under either state or federal constitutions merely because defendant had been classified as 'mentally ill' with borderline or transient psychosis).

*Id.* 500 Pa. at 74, 75, 76, 77, 454 A.2d at 968, 969. Finally, in *Zettlemoyer,* we concluded that "the death penalty is not 'cruel punishment' within the provisions of Art. I § 13 of the Pennsylvania Constitution, and, further, that the sentencing procedures adopted by the General Assembly and set forth at Section 9711 of the Sentencing Code, 42 Pa.C. S.A. § 9711, are permissible under the Constitutions of the State and of the United States." *Id.,* 500 Pa. at 77, 454 A.2d at 969.

## XI.

 The appellant next argues that in the penalty phase of his trial, the court erred in its instructions on unanimity and the appropriate standard with respect to weighing the aggravating and mitigating circumstances. Specifically, the appellant complains about the court's instruction to the jury where it charged:

"Remember again your verdict must be unanimous, it must be the verdict of all twelve of you. It cannot be reached by a majority vote or by any percentage, it must be the verdict of each and everyone of you."

The appellant argues that this instruction mis-states the law. He asserts that a non-unanimous verdict is, nonetheless, a valid verdict of life imprisonment. Appellant argues that the trial court's instruction that the jury's verdict must be unanimous only served to confuse the jurors. "The guiding principle in reviewing an allegedly erroneous jury instruction is that the charge is to be read in its entirety." *Commonwealth v. Zettlemoyer,* 500, Pa. 16, 46, 454 A.2d 937, 953, citing *Commonwealth v. Woodward, supra.*

The specific language cited by the appellant and claimed to be erroneous is taken out of context. The complete portion of the trial court's charge which contains the language quoted by the appellant is as follows:

"Now the verdict is for you, members of the jury. Remember and consider all of the evidence giving it the weight to which it is entitled. Remember that you are not merely recommending a punishment. The verdict you return will actually fix the punishment at death, or life imprisonment. Remember, again, that your verdict must be unanimous. It cannot be reached by a majority vote, or by any percentage. It must be the verdict of each and every one of you. Remember that your verdict must be a sentence of death if you unanimously find at least one aggravating circumstance and no mitigating circumstance, or if you unanimously find one or more aggravating circumstances which outweighs any mitigating cir-

cumstances. In all other cases, your verdict must be of life in prison, or it must be a sentence of life in prison." N.T. March 22, 1985, pp. 110–111.

Under the provisions of 42 Pa. C.S.A. § 9711(c), *Instructions to Jury*, it is provided:

"Before the jury retires to consider the sentencing verdict, the court shall instruct the jury on the following matters:

(IV). The verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.

Considering the relevant portion of the charge in its entirety, we find it is in accord with the governing statute and that there is no merit in appellant's allegation of error.

## XII.

■ Lastly, the appellant argues that the trial court erred in allowing the Commonwealth to present torture as an aggravating circumstance in the penalty phase of his case. After the jury returned its verdict of murder of the first degree, the court took a short recess before beginning the penalty hearing. During the recess the prosecutor informed appellant's counsel that the Commonwealth intended to raise and establish rape and torture as aggravating circumstances. When the penalty phase began the appellant objected to the introduction of any evidence tending to establish torture because he had no prior notice that the Commonwealth intended to proceed on that theory. The trial court overruled appellant's objection and permitted the Commonwealth to produce evidence of torture and proceed on that basis. The trial court held that there was no rule that required pre-trial notice of the aggravating circumstances which the Commonwealth intended to prove at the penalty hearing. The trial court suggested that

there was no such rule because an aggravating circumstance can arise out of the evidence as it is presented at the trial to establish the accused's guilt. The Commonwealth contends that this is exactly what happened in this case. The circumstance of torture did not arise until the testimony of the pathologist was received into evidence during trial. Dr. DiSilvio testified that the victim suffered seven major fractures to her face and numerous minor fractures. He stated:

"[W]e look for patterns, and one thing that's particularly interesting about these face injuries is that there is no area on this face that was not injured. This is not a random kind of thing that one might get into a fight with someone and punch and hit the blows where they might land. This is a regular pattern. This required, probably, at least, five blows of an average size fist, and probably more, but at least five blows systematically covering every area of this face—from the top of the right eye down to the bottom of the left side of the jaw. There is no place on this face that is unmarked by injury."

N.T. March 15, 1985, pp. 51–52.

Dr. DiSilvio further testified:

Q What I'm trying to get to, doctor, in the proper phraseology, the utilization of what object, or physical part of the body, could apply that kind of force or cause that kind of injury?

A Well, it would either have to be, you know, the fist of someone who was very strong and experienced in being able to direct the blows to land where he wanted them to land.

Q Had he wanted to do that?

A I would say so. I would say it would be very unlikely to be able to strike a person any reasonable number of blows and randomly cover the whole face. I would say that these blows were directed blows to parts of the face in an attempt to strike every part of the face.

Q So you say that there were at least five, and probably more of these blows?

A Yes.

Q Doctor, what would be the effect of these blows on this individual, the victim, Debbie Prislupsky?

A Well, I think one effect, of course, would be that they would be extremely painful; another effect would be, you know, the repeated blows would tend to gradually make the person less and less able to defend herself, and then, of course, as I say, the loss of blood, and the inhaling of the blood from the mouth and nose injuries eventually causing a person to have trouble breathing.

N.T. March 15, 1985, pp. 53, 54, 56. Concerning the bite marks on the victim's body, Dr. DiSilvio testified:

Now, the rest of the body was marked by at least thirty-five anular—which means ring-like—anular contusions, most of which resembled human bite marks. These varied in width—excuse me, they had a uniform width, but they varied in length. This is one of the characteristics of human bite marks because the width, of course, is constant—your mouth is constant—but the length of your bite varies, depending on how wide you open your mouth when you're doing that particular biting. There were thirty-five of these, many of which pierced the surface of the skin, and they had a very unusual distribution.... I found four on the right breast including the nipple area. There were two large ones over the nipple area almost completely removing the right nipple.... There was one on the left breast at the nipple area which was also severely lacerated, or torn, one up here on the thorax, sort of a double one, and six on the abdomen, two on the pelvis, on the fatty part of the female body that the pubic hair is on. On the right arm, there was one present on the upper right arm, which was lacerated; one on the ulnar, or back side of the right lower arm, the side away from the thumb. The side away from the thumb had this mark, one on the back of the right wrist, and one on the ulnar, or back aspect of the right hand, and one on the back of the right hand.

On the left arm, we have one on the upper arm, and two on the ulnar, or back side, of this arm. On the right thigh there were seven, most of which were lacerated, and some of which were overlapping, and they started up here in the hip area and went almost in a straight line down to the knee, and on the left thigh one had—I found at least six marks, three of which were overlapping here, two down here, and one here. Now, I say that I found at least thirty-five of these. Why do I say at least thirty-five? Because there were many other bruises and partially circular marks scattered in the same general areas that I cannot be sure were human bite marks because they were incomplete.

Many of these marks showed considerable bruising around them, or bleeding from them, indicating that this had occurred while the person was still alive. Many of them showed slippage or blurring at one edge, as you could see, which appeared as if the person had been moving when that bite mark occurred.

The other finding of external examination was that at the entrance to the vagina, both anteriorly, that is, in the front entrance to the vagina, and posteriorly, that is, at the back of the entrance to the vagina, there were one centimeter tears, which is about a half inch in length. N.T. March 15, 1985, pp. 28, 29, 30. Further, Dr. DiSilvio testified that the cause of the death of Debbie Prislupsky was strangulation due to externally applied force of a duration of at least two minutes. He also testified that the victim was alive during the blows to her face, alive during most of the biting of her body, and alive when she was choked.

In the sentence hearing, evidence may be presented as to any matter that the court deems relevant and admissible on the question of the sentence to be imposed and shall include matters relating to any of the aggravating or mitigating circumstances specified in subsections (d) and (e). Evidence of aggravating circumstances shall be limited to those circumstances specified in subsection (d).

42 Pa.C.S.A. § 9711(a)(2). One of the aggravating circumstances specified in subsection (d) of the statute is: "The offense was committed by means of torture." 42 Pa.C.S.A. § 9711(d)(8). When at the commencement of trial the Commonwealth announced that it would seek the death penalty, the appellant was put on notice that the Commonwealth would attempt to establish one or more of the aggravating circumstances set forth in the statute.[8] The statute does

8. At the time of the trial of this case the statute, 42 Pa.C.S.A. § 9711(d) provided for ten aggravating circumstances:

(d) **Aggravating circumstances.**—Aggravating circumstances shall be limited to the following:

(1) The victim was a fireman, peace officer or public servant concerned in official detention, as defined in 18 Pa.C.S. § 5121 (relating to escape), who was killed in the performance of his duties.

(2) The defendant paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim.

(3) The victim was being held by the defendant for ransom or reward, or as a shield or hostage.

(4) The death of the victim occurred while defendant was engaged in the hijacking of an aircraft.

(5) The victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses.

(6) The defendant committed a killing while in the perpetration of a felony.

(7) In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.

(8) The offense was committed by means of torture.

(9) The defendant has a significant history of felony convictions involving the use or threat of violence to the person.

(10) The defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.

In 1986 the statute was amended to include two additional aggravating circumstances as follows:

(11) The defendant has been convicted of another murder, committed either before or at the time of the offense at issue.

(12) The defendant has been convicted of voluntary manslaughter, as defined in 18 Pa.C.S. § 2503 (relating to voluntary manslaughter), committed either before or at the time of the offense at issue.

not provide for a specific "notice" procedure. The accused is on notice that at the sentencing hearing the court may admit any matter deemed to be relevant and admissible on the question of the proper sentence to be imposed. 42 Pa.C.S.A. § 9711(a)(2). Part of the matters that are always relevant is evidence produced at trial that tends to establish one or more of the aggravating circumstances specified in the statute. The appellant refers us to no case and our research has uncovered none that requires the Commonwealth to give pre-trial notice of the precise aggravating circumstances it intends to prove at any sentencing hearing. Further, torture is not an element of any offense charged, but rather is a factor that is statutorily relevant to the penalty that will be imposed on one after he is convicted of first degree murder.

We find no error in the Commonwealth establishing torture as an aggravating circumstance in this case. Further, on this record, we conclude that the evidence fully supports the jury's finding of torture.[9]

### XIII.

Finally, we have examined the entire record of all proceedings, including the penalty hearing, in this case and conclude that the evidence supports the finding of the aggravating circumstances found by the jury: killing committed while in the perpetration of rape, and offense com-

As amended 1986, July 7, P.L. 400, No. 87, § 1, effective in 60 days.

9. In *Commonwealth v. Nelson*, 514 Pa. 262, 279, 523 A.2d 728, 737 (1987), this Court stated: "The word torture is defined in Webster's Third New International Dictionary (unabridged) as 'the infliction of intense pain (as from burning, crushing, wounding) to punish or coerce someone; torment or agony ..., anguish of body or mind; excruciating agony....' As noted by this Court in *Commonwealth v. Pursell* ..., 508 Pa. [212] at 238, 495 A.2d [183] at 196 [ (1985) ], the general 'meaning of such a term [torture] is a matter of common knowledge,....' The word torture is generally understood as 'the infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious, or cruel manifesting exceptional depravity.'" There is sufficient evidence in this case that the victim was made to suffer an extraordinary amount of pain and suffering which was absolutely heinous, atrocious and cruel and exhibited exceptional depravity.

mitted by means of torture, 42 Pa.C.S.A. § 9711(d)(6) and (8)). The sentence of death imposed resulted from the facts and circumstances established by the Commonwealth and was not the product of passion, prejudice or any other arbitrary factor. 42 Pa.C.S.A. § 9711(h)(3)(i)—and (ii). Further, we have a duty to determine whether the sentence imposed in the instant case is excessive or disproportionate to the sentence imposed in similar cases. 42 Pa.C.S.A. § 9711(h)(3)(iii). In making this review, we have examined all of the data and information relating to similar cases complied by the Administrative Office of Pennsylvania Courts. *See Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700, 707–08 (1984) *cert. denied* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). Our review of that information and data in accordance with our duty discloses that the penalty imposed in the case is not excessive or disproportionate.

The judgment of sentence is affirmed.