654 A.2d 580

**COMMONWEALTH of Pennsylvania**

v.

**Herman Albert DONTON, Jr., Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 18, 1994.

Filed Feb. 8, 1995.

408

David R. Eshelman, Reading, for appellant.

Iva C. Dougherty, Asst. Dist. Atty., Reading, for Com. appellee.

Before BECK, HUDOCK and BROSKY, JJ.

BECK, Judge.

This case requires us to address the inchoate crime of attempt, the *corpus delicti* rule, and the authority of local police to cross jurisdictional lines while in pursuit of suspects. We also consider, with respect to appellant's sentence, the merger doctrine. After careful analysis and adherence to case law, we affirm appellant's convictions but vacate the judgments of sentence and remand for resentencing.

The testimony at trial revealed the following. In December, 1992, Diana Donton separated from her husband, appellant Herman Donton, after over twenty years of marriage. She testified that she left her husband due to his verbal abuse and his excessive drinking. Diana left the home she shared with appellant in Pike County and began living with her mother in Berks County. The couple's son, David Donton, remained living with his father. In early March, 1993, David returned home from a visit with his mother to find his father sitting in the kitchen drinking beer. Appellant asked David to retrieve ammunition for his (appellant's) .30–06 rifle. David complied with the request and watched as his father loaded the rifle. Appellant explained to David that he was going to Reading to "take her out." Because appellant previously had spoken to David on this subject, David understood appellant to mean that he intended to shoot his wife.

David started to cry and to plead with his father to "calm down" and refrain from taking the action he planned. Appellant responded that he "had to do it" and that David should "be a man about it." Appellant also stated that if he couldn't have his wife, her mother wasn't going to have her either. Appellant then left the residence to get gas in his car and upon returning, with the loaded rifle strapped to his shoulder, said to David "This is good-bye" and hugged his son. At some point in this exchange, David told his father to insure that he (David) was "taken care of" because at the very least, appellant would end up in jail. Appellant responded that David would be provided for and that he would be permitted to stay at the family residence and receive any paychecks to which appellant was entitled. Appellant then left.

After appellant drove away, David began to read several letters appellant had left behind on the mantel and the kitchen table. The letters on the mantel were written two weeks earlier, the letters on the table were written that day. One letter was addressed to appellant's parents asking forgiveness for "what he had done" and explaining that the "only way to have [Diana] forever is [to] do what I've done." The letter further stated:

If I can't have her neither can they or anyone else—she belongs to me forever now. . . . Well her mother should be happy that I'm gone. But her daughter is with me not her. I hope God forgives me the most and understands what I have done is out of love for her to be with her for eternity and let us be together and not send me to hell for this. . . . Well mom it's time to go I hope to see you up there if God forgives me.

Appellant wrote two other letters which dealt with his property and estate. These letters were dated March 6, 1993, the day appellant left his home with a loaded rifle. One letter instructed that all paychecks and income tax checks due to appellant were to go to David. The same letter gave power of attorney to David and requested that David keep appellant's dogs. It further explained that David was not responsible for "what appellant was doing" and that David should be permitted to "get the gun back." The other letter was a will that left everything to David. It was written, appellant described, "in his dying blood," and requested that "mother and father [be] buried together in one coffin if possible." The fourth letter was written to David, asking him to handle all the funeral arrangements. In the letter, appellant reiterated his request to "have us buried in the same coffin."

After reading the letters, David contacted his paternal grandfather and told him about his conversation with appellant and the letters he found. The grandfather ordered David to call the police immediately. David called the state police, gave the troopers the letters and told them that his father, as well as the rifle and its ammunition, were gone from the house. David described the car appellant was driving and the

route he likely took to reach Berks County. He gave the troopers two addresses, his maternal grandmother's address, where his mother was residing, and his uncle's address, where his grandparents and mother spent every weekend.

In response, the state police sent out a Teletype message to local jurisdictions in the area David described. The message warned law enforcement personnel of appellant's plans. In addition, a trooper contacted Diana Donton at her brother's home and told her to contact local police. Diana's sister-in-law called the police, and Chief Roy Brennan of the South Heidelberg Police responded to the call. Upon arrival at the house, Chief Brennan called the trooper who had contacted Diana and learned the specifics of the case, i.e., the substance of the letters, the description of appellant and his vehicle, and the fact that appellant was armed. The Chief advised the people in the house (at the time there were six adults and four children in the home) to turn off the outside lights and to stay away from the windows.

The Chief then went outside and took up a position at the rear of the residence in the event that appellant came from the wooded area in the back. Another officer, Douglas Goeltz, stationed himself at the entry door of the home in order to observe appellant should he approach from the street. Soon the officers observed a vehicle, matching the description given to them, driving slowly past the house. Brennan told Goeltz to stay at the residence while he confirmed the identity of the vehicle. Brennan then got in his patrol car and attempted to follow the car, but lost sight of it. Upon returning to the area, Brennan again saw the vehicle driving very slowly by the residence, and its driver looking toward the home. Convinced that appellant was the person he was seeking, Brennan called out to Goeltz as he passed the home and requested that Goeltz "back him up" so that they could apprehend appellant.

Brennan did not stop appellant in front of the house because, knowing appellant was armed, he feared for the safety of the children and adults inside. He waited for Goeltz's assistance before stopping appellant. After appellant drove slowly by the house the second time, he crossed a small

bridge. He then turned around in a residential driveway just beyond the bridge and began to drive back toward the residence. At that point, Brennan and Goeltz blocked his path, put on their patrol car lights and commanded him to stop. As Brennan approached the car from the driver's side, Goeltz approached from the passenger's side. When he saw appellant reach for his weapon, Goeltz reached into the vehicle and grabbed the loaded .30–06 rifle that was lying on the front seat next to appellant. The weapon was equipped with a scope that allowed appellant to shoot his target from a distance.

Appellant was arrested and charged with attempted murder, aggravated assault, possessing an instrument of crime and other related crimes. At trial, a friend of appellant's who lives in Berks County testified that appellant left his hunting license at the friend's house over the Christmas holidays. He stated that appellant was scheduled to visit him the weekend he was arrested in order for the friend to fix appellant's rifle so that the two could go hunting. Appellant also testified at trial. He claimed that he was driving by his brother-in-law's house on March 6th in order to visit another relative who lived on the same street, that he then intended to visit his friend who would fix his rifle, and that he and the friend planned to hunt that weekend. He also testified that he had left his hunting license at the friend's house months earlier. On rebuttal, David testified that while his father was awaiting trial, he contacted his son and requested that David deliver his (appellant's) hunting license to the friend who lived in Berks County.

Appellant described the letters discovered by his son as notes to himself, never meant for anyone else to read, written while he was depressed over his failing marriage. He explained that the phrases he used regarding "things being over" or "saying good-bye" referred to his relationship with his wife and his plan to move away from the area. He also testified that he at one point considered committing suicide but denied ever intending to kill his wife.

██ The jury returned verdicts of guilty on all counts and appellant filed a timely appeal raising several trial errors. His first challenge concerns the attempted murder and aggravated assault convictions.[1] As appellant properly notes, both crimes require that appellant, with the requisite intent to commit the offense, take a substantial step toward its commission.

██ Originally, conviction for criminal attempt required proof that a defendant committed an overt act with the intent of completing a crime, but fell short of actually completing it. *See Commonwealth v. McCloskey*, 234 Pa.Super. 577, 341 A.2d 500, 501 (1975). In 1972, with the enactment of the crimes code, the legislature broadened the definition of attempt by defining it as follows:

> A person commits an attempt when, with the intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime.

18 Pa.C.S.A. § 901(a). This definition has been interpreted by this court as an expansion of the crime of attempt in that it no longer concentrates on the acts that remain to be done by the defendant but instead focuses on the acts the defendant has completed. *See Commonwealth v. Gilliam*, 273 Pa.Super. 586, 417 A.2d 1203, 1205 (1980). In deciding whether the evidence presented at trial was sufficient to make out a case of attempt, we view the entirety of the evidence in the light most favorable to the Commonwealth and consider whether the fact finder could conclude that a substantial step toward a specific crime has been taken. *See id.; Commonwealth v. Melnyczenko*, 422 Pa.Super. 363, 619 A.2d 719 (1992), *alloc. denied*, 536 Pa. 628, 637 A.2d 288 (1993).

The *Gilliam* and *Melnyczenko* cases are instructive on evaluating the substantial step requirement. In *Gilliam*, the appellant, an inmate, was convicted of criminal attempt to escape. Evidence revealed that the bars on the window of the

---

1. Obviously, appellant was convicted of the "attempt variety of aggravated assault." The statute prohibits the attempt to cause serious bodily injury to another or the causing of such injury. *See* 18 Pa.C.S.A. § 2702(a)(1).

Gilliam's cell had been cut and that he was in possession of a pair of visegrips and two knotted extension cords attached to a hook. We found that it "was of no consequence that appellant was not actually in the process of elopement when arrested" and held that the evidence, taken as a whole, constituted a substantial step toward escape. *See Gilliam, supra* 273 Pa.Super. at 588–590, 417 A.2d at 1205 (appellant's acts of manufacturing and assembling the paraphernalia necessary for escape, as well as cutting through the bars, coupled with evidence from which the jury could infer intent to escape, was sufficient).

In *Melnyczenko,* we addressed the issue of whether a person can be convicted of attempted burglary in the absence of proof of a physical attempt to enter a structure. The appellant in that case was observed driving twenty miles from his home to a residential neighborhood where he parked his car. Dressed in dark clothing, he then began walking into the rear yards of the houses. In his possession, police found a heavy gauge screwdriver, a pry bar, two flashlights, a knit cap, and a pair of gloves.

Despite the lack of evidence of an attempted break-in of the houses, or any evidence of tampering, we affirmed the conviction and refused to hold that a defendant cannot be convicted of attempted burglary until he physically tampers with a building. We found that:

> [T]he evidence ... taken in its entirety warrants a conclusion that appellant was reconnoitering the area both with the intent to burglarize a residence and with sufficient means to carry out his intent. With those actions, appellant took a substantial step toward commission of the crime of burglary.

*Melnyczenko,* 422 Pa.Super. at 367, 619 A.2d at 721.

The facts of the instant case are far more compelling than *Melnyczenko* and present sufficient evidence of a substantial step on appellant's part both to do serious bodily injury to his wife and to cause her death. Appellant's statements to his son, as well as his letters, show a clear intent to

kill Diana Donton. Appellant's acts of loading his gun, which was equipped with a scope, and then driving ninety miles to the house where his estranged wife was staying, with his weapon in easy reach, clearly constitute a substantial step toward the commission of those crimes. Like the *Melnyczenko* case, appellant was apprehended while reconnoitering the area with both the intent to kill his wife and sufficient means to carry out his intent. For the Commonwealth to prove its case, it need not establish that appellant fired a shot at his wife, or even aimed the gun at her, before he was apprehended. When evaluated under settled principles of law, the facts of this case amply support the attempt convictions for murder and aggravated assault. Indeed, they present an even stronger case than that presented in *Melnyczenko*.

Appellant next argues that the only evidence of a crime in this case is contained in the substance of his letters and statements to his son David. He claims that these admissions cannot be the basis of a conviction since that would violate the rule of *corpus delicti*.

Clearly, "a criminal conviction may not be based on the extra-judicial confession or admission of the defendant unless it is corroborated by independent evidence establishing the *corpus delicti*." *Commonwealth v. Ware*, 459 Pa. 334, 329 A.2d 258, 274 (1974). The *corpus delicti* rule is a rule of evidence rooted in the reluctance of our system of justice to convict a person based on his or her statements alone. *Commonwealth v. Buck*, 426 Pa.Super. 26, 626 A.2d 176, 177 (1993). The rule provides that despite the inculpatory nature of a defendant's extra-judicial statements, a case may not go to the fact finder where independent evidence does not suggest that a crime has been committed. However, the Commonwealth is not required to prove the existence of the crime beyond a reasonable doubt before introducing an extra-judicial admission. *Commonwealth v. Edwards*, 521 Pa. 134, 555 A.2d 818, 823 (1989) (citing *Commonwealth v. Byrd*, 490 Pa. 544, 417 A.2d 173 (1980)).

In the instant case, the Commonwealth offered independent proof of the commission of a crime. Indeed, the same evidence which constituted the substantial step necessary for the attempt convictions is the evidence which "suggests that a crime has been committed." The evidence established that appellant, armed with a loaded rifle equipped with a scope, drove some ninety miles to another county where his estranged wife (who had recently ended their relationship) was located, arrived at the home and began his "surveillance" of the residence with his weapon by his side. While this evidence may not be sufficient to convict appellant of the crimes for which he was convicted, such is not the burden of the Commonwealth in establishing the *corpus delicti*. All that is required is independent proof suggesting the commission of a crime. *See Edwards, supra.*

We also find compelling the Commonwealth's additional argument supporting the existence of the *corpus delicti*. The law is clear that "where two crimes are closely related and have arisen out of the same transaction, the establishment of the *corpus delicti* for one of them is sufficient to permit receipt of the defendant's admission or confession even though it implicates him in the other crime as well." *Commonwealth v. DiSabatino*, 399 Pa.Super. 1, 581 A.2d 645, 647 (1990). The prosecution plainly established the *corpus delicti* for the crime of carrying a loaded weapon in violation of 18 Pa.C.S.A. § 6106.1. Appellant's admissions to his son, and those in his letters, explained his intentions to use the weapon on that night. The violation of § 6106.1 was closely related to appellant's plan to kill his wife and certainly arose out of the same transaction. *See DiSabatino, supra.* We find no violation of the *corpus delicti* rule.

Appellant next challenges the trial court's refusal to suppress the weapon and ammunition found in his car and the statements he made to police after his arrest. He claims that the police had no authority to stop him because they lacked probable cause and were outside their jurisdiction at the time of the stop. Apparently, the Berks County residence which Diana Donton was visiting is quite close to the Lancaster

County line, so that when appellant crossed the bridge and turned around in a neighboring driveway, he entered Lancaster County. It was at this point that Chief Brennan and Officer Goeltz made the arrest.

 Appellant relies on the Statewide Municipal Police Jurisdiction statute, 42 Pa.C.S.A. § 8953, which provides that an officer shall have the power and authority to enforce the law beyond the limits of his primary jurisdiction where:

> [T]he officer is in hot pursuit of any person for any offense which was committed, or which he has probable cause to believe was committed, within his primary jurisdiction and for which offense the officer continues in fresh pursuit of the person after the commission of the offense.

42 Pa.C.S.A. § 8953(a)(2). This provision recently was addressed by our supreme court in *Commonwealth v. McCandless*, 538 Pa. 286, 648 A.2d 309 (1994). The *McCandless* court held that § 8953 requires a law enforcement officer to have probable cause prior to entering a neighboring jurisdiction. Conduct which raises the officer's suspicions and prompts investigation is not enough. *Id.*, at 289, 648 A.2d at 311.

 We conclude that the officers here had probable cause when they followed appellant into Lancaster County and effectuated his arrest there.[2] On the night in question, police spoke directly with state troopers in Pike County who informed them that appellant had left the area approximately one and one half hours earlier and was headed toward a Berks

2. In finding that suppression was not appropriate, the trial court relied on *Commonwealth v. Montgomery*, 513 Pa. 138, 518 A.2d 1197 (1986), *cert. denied*, 480 U.S. 935, 107 S.Ct. 1579, 94 L.Ed.2d 769 (1987). The *Montgomery* court interpreted 42 Pa.C.S.A. § 8901, Intra–State Hot Pursuit. The court held that pursuant to § 8901, probable cause to arrest was not required before a pursuing officer crossed his jurisdictional boundary. *Id.*, 513 Pa. at 143–44, 518 A.2d at 1200. Section 8901 was repealed in 1982 and replaced with § 8953(a)(2), the provision addressed by *McCandless*.

Because we can affirm a trial court's proper decision even if its reasoning was erroneous, we affirm the ruling of the suppression court here based on our reasoning above. *See Commonwealth v. Harper*, 416 Pa.Super. 608, 611 A.2d 1211, 1213 (1992) (appellate court has the power to affirm any ruling of the trial court despite its erroneous basis, as long as the ruling is justified by other reasons).

County address with a loaded rifle intending to kill his estranged wife. Chief Brennan learned the make, model, and color of the car appellant was driving as well as a partial registration and an identifying sticker on the rear bumper. He also was told the type of weapon appellant was carrying. The Chief testified that he was familiar with the high-powered rifle and had handled one previously.

At approximately the time it would take one to travel from Pike County to Berks County, the officers observed a car matching the description driving slowly by the house which Diana Donton was visiting. In an attempt to identify the vehicle, one of the officers followed the car but lost sight of it. The car soon returned and again drove slowly by the residence, its driver looking into the house. It travelled across a small bridge some 1500 feet across the county line, turned around in a neighbor's driveway and headed back toward the home of Diana Donton's brother. The officers continued to pursue the vehicle, but decided not to stop it in front of the house, fearing for the safety of the adults and children inside. At a safe location nearby the home, the officers ordered appellant to stop his car and then arrested him.

We believe these facts establish probable cause. Police had information from another law enforcement agency that appellant was en route to Berks County to attempt to murder his wife. As predicted, appellant appeared on the street where his wife was staying. The officers' positive identification of the vehicle, appellant's peculiar behavior and all the other facts of which the officers were aware gave them probable cause to pursue and arrest appellant. These factors were observed while the officers were within their primary jurisdiction. Further, their decision to stop appellant just outside the county line was a strategic and appropriate one. We conclude that the officers' actions were in accordance *McCandless* and, therefore, find no error in the court's refusal to suppress.

Appellant's final claims concern his sentence. For his convictions of attempted murder and aggravated assault, appellant received consecutive sentences. He argues that these

charges should merge for purposes of sentencing. At the time of sentencing, the controlling case on this issue was *Commonwealth v. Anderson*, 416 Pa.Super. 203, 610 A.2d 1042 (1992), *alloc. granted*, 535 Pa. 629, 631 A.2d 1003 (1993). The superior court, in a divided *en banc* opinion, held that the crimes of attempted murder and aggravated assault require different mental states and therefore do not merge for sentencing purposes. *Id.*, 416 Pa.Super at 220–25, 610 A.2d at 1051–53. Since the filing of briefs and argument in this case, the Pennsylvania Supreme Court decided *Anderson* and reversed the majority of the superior court. *See Commonwealth v. Anderson*, 538 Pa. 574, 650 A.2d 20 (1994). The court held:

> The act necessary to establish the offense of attempted murder—a substantial step towards an intentional killing—includes, indeed coincides with, the same act which was necessary to establish the offense of aggravated assault, namely, the infliction of serious bodily injury. Likewise, the intent necessary to establish the offense of attempted murder—specific intent to kill—is greater than and necessarily includes the intentional, knowing, or reckless infliction of serious bodily injury. It is tautologous that one cannot kill without inflicting serious bodily injury. Inasmuch as aggravated assault, the lesser offense, contains some but not all the elements of the greater offense, attempted murder, the offenses merge for purposes of sentencing.

*Id.*, at 582, 650 A.2d at 24. Because the trial court did not have the benefit of the supreme court's opinion in *Anderson* at the time of sentencing, it properly followed the existing law with respect to this issue. However, appellant's preservation of the issue and the subsequent change in law require that we vacate the judgments of sentence and remand for resentencing in accordance with the current law. As a result of the remand, appellant's challenges to the discretionary aspects of his sentence need not be addressed.

Judgments of sentence vacated; matter remanded for resentencing. Jurisdiction relinquished.

BROSKY, J., concurs in the result.