J-S06009-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
  :
v.   :
  :
  :
  :
DESEAN M. THOMPSON   :
  :
Appellant   :   No. 1776 EDA 2018

Appeal from the PCRA Order Entered May 25, 2018
In the Court of Common Pleas of Chester County Criminal Division at
No(s):  CP-15-CR-0004424-2012

BEFORE:  BOWES, J., DUBOW, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY BOWES, J.:            **FILED JUNE 25, 2019**

Desean M. Thompson appeals from the order that denied his petition

filed pursuant to the Post Conviction Relief Act ("PCRA").  We affirm.

The PCRA court summarized the history of this case as follows.

> [Appellant] was arrested and charged with five counts of
> rape by threat of forcible compulsion, four counts of involuntary
> deviate sexual intercourse by threat of forcible compulsion, five
> counts of sexual assault, two counts of aggravated indecent
> assault, five counts of indecent assault and one count of terroristic
> threats.  These charges arose from [Appellant]'s assault on a 21
> year old victim in a public park in Coatesville, Chester County,
> Pennsylvania, on August 5, 2012.  [Appellant] and the victim, who
> did not know one another prior to the night in question, met in a
> bar and then walked to Ash Park where [Appellant] repeatedly
> raped the victim and threatened her with the blade of a knife, over
> a period of several hours.
>
> Following a three day jury trial, on October 9, 2013,
> [Appellant] was found guilty of all counts charged.  On November
> 18, 2014, [Appellant] was sentenced to an aggregate sentence of
> 20½ to 45 years imprisonment on five counts of rape and one
> count of terroristic threats.  By order dated October 3, 2014,
> [Appellant] was determined to be a sexually violent predator

pursuant to 42 Pa.C.S.A. § 9799.24, subject to the lifetime registration requirements under 42 Pa.C.S.A. §§ 9799.10 *et seq*.

On December I, 2014, [Appellant] filed a post sentence motion . . . for reconsideration and reduction of sentence and . . . challenging the sufficiency of evidence and . . . the weight of the evidence.  By order dated February 2, 2015, [Appellant]'s motion for a new trial was denied; however, [Appellant]'s motion for reconsideration of sentence was granted.  On April 17, 2015, [Appellant] was sentenced to an aggregate sentence of 18 to 45 years incarceration on five counts of rape and one count of terroristic threats.  . . .  On February 2, 2016, the Superior Court affirmed [Appellant]'s sentence.  [Appellant, through counsel,] timely filed a PCRA [petition] on January 27, 2017[,] alleging trial counsel was ineffective[.]

PCRA Court Opinion, 5/25/18, at 1-2 (footnote and unnecessary capitalization omitted).  After a hearing at which Appellant and trial counsel testified, the PCRA court denied Appellant's petition by order and opinion of May 25, 2018.  This timely appeal followed, and both Appellant and the PCRA court complied with Pa.R.A.P. 1925.[1]

Appellant presents this Court with the following questions:

Was it error to deny the PCRA Petition which established that Appellant's conviction and sentence resulted from the ineffective assistance of counsel which, in the circumstances of this particular case, so undermined the truth determining process that no reliable adjudication of guilt or innocence could have taken place[?]  Specifically, Appellant alleges that the court should have found that Appellant suffered from the ineffective assistance of counsel in that:

---

[1] On February 18, 2019, Appellant filed in this Court a petition to supplement the record, as the notes of testimony from the PCRA hearings were not included in the certified record.  This Court granted the petition by order filed March 5, 2019, and the transcripts were received on May 10, 2019.

A.     [Counsel should] have filed and litigated a motion to suppress Appellant's statements after Appellant invoked his Fifth Amendment right to counsel by advising the interrogating detective that he desired an attorney. And Appellant requested this motion to be filed by counsel and the failure to file such motion lacked any reasonable basis[.]

B.     [Counsel should] have objected and moved for a mistrial based on several references at trial, especially during the Commonwealth's closing argument, to the fact that Appellant failed to speak with or come into the Coatesville Police Station to speak with Detective [Sean] Dowds during his investigation[.]

C.     [Counsel should] have objected to improper and unfounded expert testimony elicited from lay witnesses by the Commonwealth. Specifically:

   1.     Testimony presented by the SAFE nurse, Marvin Jackson[,] wherein he testified that there is often no bruising in the genital area and there have been studies comparing consensual versus nonconsensual sex which show that in 80-90% of the nonconsensual cases there will be no bruising in the genital area. This witness was not qualified as an expert in any field and had no basis to render the hearsay opinion he did regarding bruising;

   2.     Testimony presented by Coatesville Detective Sean Dowds when he testified as an expert regarding information available in cell phone records. Detective Dow[ds] testified that a phone record of any kind would not be able to corroborate whether or not a cell phone was dead or had power at any given time. There was no foundation laid for this opinion and this testimony was improper[.]

D.     [Counsel should] have objected and moved for a mistrial based on the fact that Detective Dowds testified that he included information in his report and about his meeting at Ash Park with Mikea Hines, but that report was never turned over to the defense in violation of mandatory discovery[.]

Appellant's brief at 7-9 (citations and unnecessary capitalization omitted).

We begin with the legal tenets pertinent to our review. "Our standard of review for issues arising from the denial of PCRA relief is well-settled. We must determine whether the PCRA court's ruling is supported by the record and free of legal error." ***Commonwealth v. Johnson***, 179 A.3d 1153, 1156 (Pa.Super. 2018) (internal quotation marks omitted). Further, "[i]t is an appellant's burden to persuade us that the PCRA court erred and that relief is due." ***Commonwealth v. Miner***, 44 A.3d 684, 688 (Pa.Super. 2012).

Appellant's claims relate to allegations that his trial counsel rendered ineffective assistance. Counsel is presumed to be effective, and a PCRA petitioner bears the burden of proving otherwise. ***Commonwealth v. Becker***, 192 A.3d 106, 112 (Pa.Super. 2018). To do so, the petitioner must plead and prove (1) the legal claim underlying his ineffectiveness claim has arguable merit; (2) counsel's decision to act (or not) lacked a reasonable basis designed to effectuate the petitioner's interests; and (3) prejudice resulted. ***Id***. The failure to establish any prong is fatal to the claim. ***Id***. at 113.

"Boilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective." ***Commonwealth v. Sandusky***, 203 A.3d 1033, 1044 (Pa.Super. 2019) (cleaned up). Rather, "where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." ***Becker***, ***supra*** at 117 (internal quotation

marks omitted). "A finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Id*. (internal quotation marks omitted). In order to satisfy the prejudice prong, "the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." *Commonwealth v. King*, 57 A.3d 607, 613 (Pa. 2012).

With these principles in mind, we turn to the claims of error presented by Appellant. First, Appellant argues that the PCRA court erred in denying his claim that trial counsel, Loreen M. Kemps, Esquire, was ineffective in failing to move to suppress his statements made to police after Appellant had invoked his right to counsel. Appellant's brief at 21-27. The PCRA court addressed Appellant's contention as follows.

> Even if we were to determine that [Appellant's] argument has merit, a reasonable basis existed for not filing a suppression motion. It was established by the testimony of Ms. Kemps that the defense, from the beginning, was that [Appellant] and the victim had engaged in consensual intercourse. The only way to present this evidence to the jury would be through this recorded interview or through [Appellant]'s testimony. Ms. Kemps testified that the better strategy would be to allow the statement into evidence and [Appellant] would not have to testify. Ms. Kemps testified that she was not confident that [Appellant] could withstand cross examination. . . . Ms. Kemps was not willing to take that risk; therefore, as part of her trial strategy, she did not file a suppression motion and allowed the statement to be entered into evidence. The jury was able to hear the facts as presented

by [Appellant], without putting [Appellant] on the witness stand. Ms. Kemps testified that she explained this strategy to [Appellant] on more than one occasion. [Appellant] testified that it was his decision alone not to testify at trial. Therefore, because trial counsel had a reasonable basis for not pursuing a motion to suppress, [Appellant]'s claim of ineffective assistance of counsel is without merit.

PCRA Court Opinion, 5/25/18, at 10-11.

We discern no reason to disturb the PCRA court's determination. The record supports its recitation of the facts. *See* N.T. PCRA Hearing, 4/4/18, at 22-26 (trial counsel testifying that the admission of the statement was the best way to present Appellant's claim of consent, as well as to demonstrate his cooperation with the police investigation, as the statement contained the information she would have elicited from Appellant if he testified, but he would not be exposed to hostile cross examination); N.T. Trial, 10/9/13, at 81-88 (Officer Dowd testifying to Appellant's description of a consensual encounter).

Counsel's decision was reasonably designed to effectuate Appellant's interests. *See Commonwealth v. Rosario*, 652 A.2d 354, 367 (Pa.Super. 1994) ("We cannot say that counsel was ineffective for failing to seek suppression of appellant's statement . . . regardless of how it was obtained, in light of the fact that it formed the basis for his defense."). Moreover, Appellant's bald claims of prejudice do not satisfy his burden of establishing that the result of the trial would have been different had the statement not been entered to further his consent defense. Accordingly, no relief is due on this issue.

Next, Appellant contends that the PCRA court erroneously denied his claim that trial counsel rendered constitutionally-deficient performance in failing to move for a mistrial when Detective Dowds made references to Appellant's pre-arrest silence "as a tacit admission of guilt." Appellant's brief at 28. Appellant relies upon our Supreme Court's plurality decision in **Commonwealth v. Molina**, 104 A.3d 430 (Pa. 2014) (OAJC), that "the use of pre-arrest silence as substantive evidence of guilt violates a non-testifying defendant's constitutional rights." **Id**. at 432.

The PCRA court concluded that, unlike the defendant in **Molina**, Appellant never refused to speak with Detective Dowds, but rather was the one who initiated contact and told the detective that he wanted to talk with him when Appellant returned to Coatesville from Philadelphia. PCRA Court Opinion, 5/25/18, at 14. The court thus found **Molina** distinguishable in that Appellant never invoked his right to remain silent. **Id**. at 15. The PCRA court further determined that trial counsel acted reasonably in deciding to use the testimony about Appellant's contact with the police elicited on cross examination to support his theory of the case: that he had engaged in consensual sex with the victim and cooperated with law enforcement. **Id**. at 14-15.

The trial testimony in question is as follows:

Q     And can you please tell the jury when and how you first attempted to interview the [Appellant]?

A       I had heard that the [Appellant] had left town. I requested first to his girlfriend, Ashley Harris, if she would please have him call me. I also attempted to call him. He actually called me back. I spoke with him, I asked him to come in and speak with me so that I could interview him regarding the sexual assault.

Q       When he called you back again, can you tell the jury when you first made phone contact with [Appellant]?

A       I believe I first made phone contact with him September 10th.

Q       Okay. And when you made phone contact with him on September 10th, what did you tell him?

A       I asked him if he would please come in and talk to me about the events that happened on August 4th and 5th of 2012.

Q       And in the course of those conversations, did [Appellant] give you any indication that he knew what you were talking about, that he knew what events that you wanted to talk to him that occurred in August?

A       He did.

Q       What did he tell you in this phone conversation?

A       He told me that he had met a girl at the Kool Bar, he was intoxicated, he was high on wet, and he doesn't remember exactly what happened but knows he didn't rape that girl.

Q       And after he told you that, what did you ask him to do?

A       I asked him to come in and tell me his story.

Q       And did the [Appellant] tell you where he was when you were on the phone?

A       He did.

Q       Where did he say he was at that point?

A       In Philadelphia.

Q    After you spoke to the [Appellant] on September 10th, 2012, did he come in to tell you what had happened?

A    No, he did not.

Q    Did you make any efforts to -- further efforts to reach out to him?

A    I did.

Q    Can you describe that to the jury.

A    I called him another time and asked him to come in and speak with me.  I said I hadn't talked to him for a while, I thought he was going to come in and speak with me, and that I was trying to make another attempt to get him to come.

Q    And what was the [Appellant]'s reaction to that?  Did he come right away?

A    No, he did not.

Q    What did he tell you in terms of coming in?

A    He said he needed to speak to an attorney.  He would come in sometime in October, I believe.

Q    And in October did the [Appellant] come in and speak to you?

A    No, he did not.

Q    At some point were you finally able to speak to the [Appellant]?

A    I was.

Q    And can you tell the jury how it was that you were finally able to speak to the [Appellant]?

A    I spoke to him after we picked him up on the warrant that I filed.

Q      And do you recall and can you tell the jury what date it was that he was arrested on that warrant?

A      I believe it was November 19th, 2012.

N.T. Trial, 10/9/13, at 76-78.

Counsel wove the testimony into closing arguments, advocating as follows:

[Appellant] goes back to the same bar the very next day with a friend of his. . . . While he is there somebody comes in and that is the first he hears anything about a possible rape. Does he deny being in the park? No. He says, according to his statement, I didn't rape that girl. I didn't rape that girl. He calls the police when asked to.

If you follow the sequence, the police tell [Appellant's] ex-girlfriend or girlfriend, to call him. At some point he calls them. He says he wants to come in. Says he is not in the Coatesville area, but he gives them a telephone number as to where he can be reached. They don't say to him right then and there we have a warrant for your arrest, you have to come in. There is no testimony to that effect.

He says he needs to get back to Coatesville. He is not in Coatesville at that time. He is not hiding where he is. The Detective calls him two weeks later on the number that he gave. He answers the phone and, again, he talks to the Detective. There is no indication here that there were a series of phone calls that weren't returned, that there were attempts or hang-ups or that they had to track down other numbers. And, again, he says I'll probably be back in October. I want to come in and talk to you. And he is doing what the logical thing would be, I submit to you, hoping to get money for an attorney to help him because he believes there may be some accusations that are going to be filed against him.

N.T. Trial, 10/9/13, at 125-26.

- 10 -

Appellant has failed to convince us that the PCRA court abused its discretion in denying this claim. The testimony at issue contains no indication that Appellant invoked his right to remain silent by refusing to speak to the police. *Cf. Molina*, *supra* at 433 ("I asked him if he could come into our office and sit down and talk with me about the case, and he refused. He said he refused to come in."). Further, given counsel's use of the testimony to support Appellant's trial strategy, Appellant failed to establish the lack-of-a-reasonable-basis prong of the claim. No relief is due.

Appellant's remaining issues concern trial counsel's failure to object to expert testimony offered by lay witnesses, and the Commonwealth's failure to turn over a report covered by mandatory discovery. Appellant's brief at 35-44. Upon a review of the certified record, the parties' briefs and the relevant law, we discern no abuse of discretion on the part of the PCRA court as to these issues, and we affirm the order denying his PCRA claims on the basis of the opinion that the Honorable Jacqueline C. Cody entered on May 25, 2018. *See* PCRA Court Opinion, 5/25/18, at 16-20 (discussing Appellant's failure to establish the prejudice prong regarding the claim that counsel should have objected to improper expert testimony); *id*. at 22-26 (explaining that Appellant failed to prove that the outcome would have been different had counsel objected to a discovery violation, as the report at issue was consistent with the evidence at trial).

As Appellant has not met his burden of convincing this Court that the PCRA court's rulings were the product of an abuse of discretion or an error of law warranting relief from this Court, *see Miner*, *supra* at 688, we affirm the order denying his petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/25/19

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

: CHESTER COUNTY, PENNSYLVANIA

VS.

: CRIMINAL ACTION

DESEAN THOMPSON : NO. CP-15-CR-0004424-2012

Erik T. Walschburger, Esquire, Deputy District Attorney, on behalf of the Commonwealth of
 Pennsylvania
Colin R. Hueston, Esquire, on behalf of Defendant


## MEMORANDUM OPINION

This matter is before the Court for consideration of Defendant's Petition for Relief Pursuant to the Post Conviction Relief Act, 42 Pa.C.S.A. §§ 9541 *et seq.* (PCRA). Defendant asserts that he was deprived of effective assistance of counsel and seeks to have his sentence vacated and the matter remanded for a new trial. The Commonwealth responds that Defendant's allegations of ineffective assistance of counsel are without merit; therefore, the petition should be dismissed.

Defendant was arrested and charged with five counts of rape by threat of forcible compulsion, four counts of involuntary deviate sexual intercourse by threat of forcible compulsion, five counts of sexual assault, two counts of aggravated indecent assault, five counts of indecent assault and one count of terroristic threats. These charges arose from Defendant's assault on a 21 year old victim in a public park in Coatesville, Chester County, Pennsylvania, on August 5, 2012. Defendant and the victim, who did not know one another prior to the night in question, met in a bar and then walked to Ash Park where Defendant repeatedly raped the victim and threatened her with the blade of a knife, over a period of several hours.

Following a three day jury trial, on October 9, 2013, Defendant was found guilty of all counts charged. On November 18, 2014, Defendant was sentenced to an aggregate sentence of 20 ½ to 45 years imprisonment on five counts of rape and one count of terroristic threats.[1] By Order dated October 3, 2014, Defendant was determined to be a sexually violent predator pursuant to 42 Pa.C.S.A. § 9799.24, subject to the lifetime registration requirements under 42 Pa.C.S.A. §§ 9799.10 et seq.

On December 1, 2014, Defendant filed a Post Sentence Motion Pursuant to Rule 720 for Reconsideration and Reduction of Sentence and New Trial Pursuant to Rule 606 Challenging the Sufficiency of Evidence and Rule 607 Challenging the Weight of the Evidence. By Order dated February 2, 2015, Defendant's Motion for a New Trial was denied; however, Defendant's Motion for Reconsideration of Sentence was granted. On April 17, 2015, Defendant was sentenced to an aggregate sentence of 18 to 45 years incarceration on five counts of rape and one count of terroristic threats. Defendant received credit for time served from November 19, 2012 to April 17, 2015 and was deemed ineligible for RRRI. On February 2, 2016, the Superior Court affirmed Defendant's sentence. Defendant timely filed a PCRA on January 27, 2017 alleging trial counsel was ineffective based upon the following allegations:

1. Trial counsel failed to file a suppression motion seeking to suppress statements Defendant made while being interviewed by Detective Sean Dowds when Defendant requested counsel and Detective Dowds continued to interview him.

2. Trial counsel failed to object and move for a mistrial based upon references made to Defendant's failure to speak with police during the investigation.

3. Trial counsel failed to object to expert testimony offered by lay witnesses, including testimony offered by SAFE nurse Martin Jackson and testimony offered by Detective Sean Dowds.

---

[1] All remaining charges merged with rape.

2

R2

4. Trial counsel failed to object to a jury charge regarding flight of the Defendant.

5. Trial counsel failed to object to Detective Sean Dowd's testimony regarding a meeting between himself and the victim in Ash Park, allegedly memorialized in a police report never turned over to Defendant.

6. Trial counsel failed to conduct a proper investigation, including trial counsel's failure to secure video surveillance from the Kool Bar and obtain all cell phone records to refute the victim's claim that her cell phone was dead and she received no calls.

The law presumes that counsel has rendered effective assistance. Commonwealth v. Lane, 81 A.3d 974 (Pa.Super. 2013). Defendant "must establish by a preponderance of the evidence that counsel's ineffectiveness so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." Commonwealth v. Johnson, 966 A.2d 523, 532 (Pa. 2009). In order to successfully prove a claim of ineffective assistance of counsel, Defendant must prove the following 3 elements as set forth in Commonwealth v. Pierce, 515 Pa. 153, 527 A.2d 973, 975-76 (1987):

> (1) The underlying legal claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice because of counsel's ineffectiveness.

Commonwealth v. Paddy, 609 Pa. 272, 292, 15 A.3d 431, 442 (2011) (citations omitted).

> "The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit..." Commonwealth v. Pierce, 537 Pa. 514, 524, 645 A.2d 198, 194 (1994). "counsel cannot be found ineffective for failing to pursue a baseless or meritless claim." Commonwealth v. Poplawski, 852 A.2d 323, 327 (Pa.Super. 2004).

Commonwealth v. Taylor, 933 A.2d 1035, 1041-42 (Pa.Super. 2007).

3

R3

With regard to reasonable basis, we must examine whether counsel's actions had any reasonable basis rather than whether there was a more logical course of action counsel could have pursued. Paddy, at 292, 15 A.3d at 442. In order for a chosen strategy to be found to have been unreasonable, it must be proven that the path not chosen "offered a potential for success substantially greater that the course actually pursued." Commonwealth v. Miller, 605 Pa. 1, 18, 987 A.2d 638, 648-49 (2009) (citation omitted).

In order to prove prejudice, "a defendant must show that but for counsel's error, there is a reasonable probability, *i.e.*, a probability that undermines confidence in the result, that the outcome of the proceeding would have been different." Miller, at 1, 18, 987 A.2d at 648 (citation omitted). If the defendant fails to satisfy any of these three elements, the claim will fail. Taylor, at 1041.

1. Failure to File Motion to Suppress:

Defendant argues that trial counsel was ineffective for failing to file a Motion to Suppress the statement of Defendant to Detective Sean Dowds. Specifically, Defendant contends that inculpatory statements made by him during the interview with Detective Dowds on November 19, 2012 were admitted into evidence despite the fact that he requested counsel. Defendant argues that Detective Dowds ignored his request for counsel and continued to question him without counsel. Moreover, Defendant contends that he requested a suppression motion be filed by trial counsel.

The Fifth Amendment right to counsel was recognized in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Miranda requires that an individual subject to custodial interrogation must be informed of his right to remain silent and his right to the presence of an attorney. Miranda, at 479, 86 S.Ct. at 1630.

4

R4

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.
>
> ....We....emphasize that it is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel.

Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378 (1981) (fn.8 omitted). The rule announced in Edwards expresses two different inquiries. "First, courts must determine whether the accused actually invoked his right to counsel....Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." Edwards, at 485, 486 n.9, 101 S.Ct. at 1885 n.9.

A defendant may waive his rights under Miranda and agree to answer questions from the police. A valid waiver of Miranda rights is made knowingly, intelligently and voluntarily. Commonwealth v. DeJesus, 567 Pa. 415, 301, 787 A.2d 394, 402 (2001) (citations omitted). The waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. The totality of the circumstances surrounding the waiver will be considered in determining whether the waiver was voluntary. Id.

> Some of the factors to be considered include: the duration and means of interrogation; the defendant's physical and psychological state; the conditions attendant to the detention; the attitude

5

R-5

exhibited by the police during the interrogation; and any other factors which may serve to drain one's powers of resistance to suggestion and coercion.

*Id.*

When determining whether a defendant has knowingly and intelligently waived his rights under <u>Miranda</u>, the court focuses on the defendant's cognitive processes such as whether the defendant was aware of the nature of the choice that he made in relinquishing his <u>Miranda</u> rights. <u>Commonwealth v. DiStefano</u>, 782 A.2d 574 (Pa.Super. 2001). The Commonwealth bears the burden of establishing, by preponderance of the evidence, that the waiver was knowing and intelligent. <u>Commonwealth v. Edwards</u>, 521 Pa. 134, 555 A.2d 818 (1989). Whether the waiver was knowing, voluntary and intelligent is to be made while considering the totality of the circumstances. *Id.*

Defendant was interviewed by Detective Sean Dowds on November 19, 2012 at the City of Coatesville Police Department. (Exhibit C-96A, p.1). The following exchange took place between Defendant and Officer Dowds:

> Det. Sean Dowds (SD): All right, Desean uh, what I'm gonna do is read you your Miranda rights, uh before we get into this, all right?
>
> Desean Thompson (DT): All right.
>
> SD: Pursuant to law, I am informing you that I am Detective Dowds, this is Detective Wright, Coatesville Police Department we're investigating a rape. You have the right to remain silent, however if you say anything such can and will be used against you in a court of law. Do you understand?
>
> DT: Yes, sir.
>
> SD: You have a right to talk to a lawyer before answering any questions and have a lawyer with you before and during questioning, do you understand this?

6

R-6

DT: Yes, sir.

SD: If you cannot afford a lawyer, you have the right to have a free lawyer appointed for you before any questions are asked and during any questioning. This free lawyer is of no expense or cost to you.

DT: And when- and when would that be appointed to me, how fast?

SD: Upon your request.

DT: I need one ASAP. (unintelligible)

SD: Do you understand this?

DT: Yeah.

SD: During questioning you may stop at any time and refuse to answer any further questions do you understand this?

DT: Yes.

SD: Understanding these rights and having them in mind, do you wish to give up these rights and talk to us now?

DT: I'll talk to ya, no problem-I'll talk to ya.

SD: So, Yes?

DT: Yes.

SD: All right, sign right there by the X.

(Exhibit C-96A, p.1-2).

During the PCRA hearing, Defendant testified that when he was interviewed by Detective Dowds on November 19, 2012, he informed the detective that he needed a lawyer as soon as possible, although he testified that he continued to speak with Detective Dowds without counsel present. Defendant further testified that he asked trial counsel, Loreen Kemps, Esquire, to file a motion to suppress statements made to Detective Dowds. Defendant testified that when

7

R-7

he met Ms. Kemps at Chester County Prison in February of 2013, she told him that she found something interesting in his statement and mentioned filing a motion to suppress at that time. Defendant testified that he saw Ms. Kemps in April 2013 and did not see her during the summer of 2013. Defendant testified that when he saw Ms. Kemps in April, 2013, she informed him that she wasn't sure if she would still be handling his case because of changes in the office of the Public Defender. Defendant testified he received a notice of trial in August of 2013 notifying him that he was now represented by Stephen F. Delano, Esquire.

Defendant testified that he did not see Ms. Kemps again until October 2013, approximately a week before trial was to start. At that time, Defendant learned that a suppression motion had never been filed. Defendant testified that he spoke with Ms. Kemps regarding whether he would testify at trial. Defendant testified that Ms. Kemps told him it would not be in his best interests to testify at trial.

Defendant further testified that he agreed to speak with the detectives and signed the card enumerating his rights under Miranda. Although Defendant testified that he did not know whether he wanted to testify at trial, he does recall telling the Court during the trial that he did not want to testify. Defendant testified that he relied upon counsel for her advice as to whether or not to testify at trial; however, Defendant acknowledged that it was his decision whether to testify at trial.

Ms. Kemps testified during the PCRA hearing that after reviewing the discovery, she determined that this was a case of consent. Ms. Kemps testified that the statement Defendant made to Detective Dowds was consistent with this defense. Although Ms. Kemps testified that initially, she generally told Defendant that there may be an issue with the statement he gave to Detective Dowds, at that time, she did not have a transcript of the statement and informed

8

R8

Defendant that there might be an issue to look into. Ms. Kemps testified that she informed Defendant that the potential to file a suppression motion was present; however, she did not guarantee that the evidence would be suppressed.

Ms. Kemps testified that the best trial strategy would be for Defendant's statement to Detective Dowds to be admitted into evidence. Ms. Kemps testified that the jury needed to hear the facts as stated by Defendant in order to put forth the defense of consent. If Defendant's statement were suppressed, the only way to get those facts into evidence would be for Defendant to testify. Ms. Kemps feared that if Defendant testified, his testimony would not be totally consistent with the statement to Detective Dowds. If that were the case, the Commonwealth would be permitted to use the statement to impeach the Defendant on cross-examination, which would suggest to the jury that Defendant was not truthful. Admission of the statement into evidence assured that there would be no cross examination of the statement at trial.

Ms. Kemps testified that she met with Defendant a number of times and explained to him that the defense of consent could not be established without the facts as he knew them and these facts had to be presented to the jury either through his statement to Detective Dowds or his testimony at trial. Ms. Kemps testified that allowing the statement to come in as evidence would be the better trial strategy and allow her to make the argument to the jury that Defendant and the victim engaged in consensual sexual intercourse.

Ms. Kemps further testified that early on in this case, Defendant did not state that he wanted her to file a suppression motion. Ms. Kemps testified that although she did not meet with Defendant in the summer of 2013, she did provide drafts of witness interviews to Defendant. Ms. Kemps testified that she did speak with Defendant during the period between

9

R 9

April 2013 and the fall of 2013 regarding the issue of suppression. Ms. Kemps testified that she explained to Defendant her trial strategy regarding suppression. Ms. Kemps testified that it is common trial strategy not to file a suppression motion where, as in this case, the testimony can be presented to the jury without the defendant testifying at trial.

Contrary to Defendant's argument, his claim lacks merit. Defendant never invoked his right to counsel. Although Defendant asked Detective Dowds how quickly he could get counsel, he never asked to have the questioning stopped and did not cease communicating with Detective Dowds. Detective Dowds asked Defendant if he understood his rights and Defendant answered in the affirmative. Defendant testified that he signed the waiver card and agreed to speak with Detective Dowds.

At no time during the approximately 30-minute interview with Detective Dowds did Defendant ask for the interview to stop or ask Detective Dowds to stop his questioning so that he could obtain an attorney. "To hold that every utterance of the word 'lawyer' automatically erects the Edwards' 'cone of silence' around the accused, thus insulating him from *all* further police-initiated questioning and communication, would be far too rigid and would not serve the interest or needs of justice." Commonwealth v. Hubble, 509 Pa. 497, 511, 504 A.2d 168, 175 (1986) (emphasis included). In light of the circumstances surrounding the interrogation, Defendant's statement that "I need one ASAP" is insufficient to stop the interrogation. Defendant knowingly and intelligently waived his right to counsel. Therefore, trial counsel cannot be found to be ineffective for failing to file a suppression motion.

Even if we were to determine that Defendant's argument has merit, a reasonable basis existed for not filing a suppression motion. It was established by the testimony of Ms. Kemps that the defense, from the beginning, was that Defendant and the victim had engaged in

10

R 10

consensual intercourse. The only way to present this evidence to the jury would be through this recorded interview or through Defendant's testimony. Ms. Kemps testified that the better strategy would be to allow the statement into evidence and Defendant would not have to testify. Ms. Kemps testified that she was not confident that Defendant could withstand cross-examination. If Defendant's testimony at trial was inconsistent with his statement to Detective Dowds, the Commonwealth could use the statement to impeach the Defendant's credibility in front of the jury. Ms. Kemps was not willing to take that risk; therefore, as part of her trial strategy, she did not file a suppression motion and allowed the statement to be entered into evidence. The jury was able to hear the facts as presented by Defendant, without putting Defendant on the witness stand. Ms. Kemps testified that she explained this strategy to Defendant on more than on occasion. Defendant testified that it was his decision alone not to testify at trial. Therefore, because trial counsel had a reasonable basis for not pursuing a motion to suppress, Defendant's claim of ineffective assistance of counsel is without merit.

II Defendant's Pre Arrest Silence:

Defendant next argues that trial counsel was ineffective for failing to object to questions regarding and references to Defendant's pre-arrest silence. Specifically, Defendant argues trial counsel was ineffective for failing to object to Detective Dowds testimony regarding Defendant's failure to speak with him prior to being arrested. Defendant argues that Detective Dowd's testimony regarding his pre-arrest silence was prejudicial and intended to infer to the jury he was guilty.

Detective Dowds testified as follows during the trial:

Q: And can you please tell the jury when and how you first attempted to interview the defendant?

11

A: I had heard that the defendant had left town. I requested first to his girlfriend, Ashley Harris, if she would please have him call me. I also attempted to call him. He actually called me back. I spoke with him, I asked him to come in and speak with me so that I could interview him regarding the sexual assault.

Q: When he called you back again, can you tell the jury when you first made phone contact with Mr. Thompson?

A: I believe I first made phone contact with him September 10th.

Q: Okay. And when you made phone contact with him on September 10th, what did you tell him?

A: I asked him if he would please come in and talk to me about the events that happened on August 4th and 5th of 2012.

Q: And in the course of those conversations, did Mr. Thompson give you any indication that he knew what you were talking about, that he knew what events that you wanted to talk to him that occurred in August?

A: He did.

Q: What did he tell you in this phone conversation?

A: He told me that he had met a girl at the Kool Bar, he was intoxicated, he was high on wet, and he doesn't remember exactly what happened but knows he didn't rape that girl.

Q: And after he told you that, what did you ask him to do?

A: I asked him to come in and tell me his story.

Q: And did the defendant tell you where he was when you were on the phone?

A: He did.

Q: Where did he say he was at that point?

A: In Philadelphia.

Q: After you spoke to the defendant on September 10th, 2012, did he come in to tell you what had happened?

12

R 12

A: No, he did not.

Q: Did you make any efforts to --further efforts to reach out to him?

A: I did.

Q: Can you describe that to the jury.

A: I called him another time and asked him to come in and speak with me. I said I hadn't talked to him for a while, I thought he was going to come in and speak with me, and that I was trying to make another attempt to get him to come.

Q: And what was the defendant's reaction to that? Did he come right away?

A: No, he did not.

Q: What did he tell you in terms of coming in?

A: He said he needed to speak to an attorney. He would come in sometime in October, I believe.

Q: And in October did the defendant come in and speak to you?

A: No, he did not.

Q: At some point were you finally able to speak to the defendant?

A: I was.

Q: And can you tell the jury how it was that you were finally able to speak to the defendant?

A: I spoke to him after we picked him up on the warrant that I filed.

. . .

Q: And do you recall and can you tell the jury what date it was that he was arrested on that warrant?

A: I believe it was November 19th, 2012.

(N.T. 10/9/2013, 76-78, 79).

13

R 13

Detective Dowds' testimony directly contradicts Defendant's argument. Defendant was not silent. Detective Dowds testified that he had phone conversations with Defendant prior to Defendant's arrest. Detective Dowds testified that Defendant wanted to speak with him about the incidents of the night in question; however, he needed to retain counsel and would come to Coatesville when he retained counsel. Detective Dowds never testified that Defendant did not want to speak with him; in fact, it was Defendant who initially called Detective Dowds. There is no testimony of record that Defendant refused to speak with Detective Dowds.

The testimony elicited from Detective Dowds on cross examination highlights Defendant's reasonable trial strategy that he cooperated with police and did not rape the victim but had consensual sexual intercourse with her. (N.T. 10/9/2013, 94-100). Counsel continued with this reasonable trial strategy through closing arguments by specifically recounting how Defendant cooperated with the police.

> Does he deny being in the park? No. He says, according to his statement, I didn't rape that girl. I didn't rape that girl. He calls the police when asked to.
>
> If you follow the sequence, the police tell Ashley, the ex-girlfriend or girlfriend, to call him. At some point he calls them. He says he wants to come in. Says he is not in the Coatesville area, but he gives them a telephone number as to where he can be reached. They don't say to him right then and there we have a warrant for your arrest, you have to come in. There is no testimony to that effect.
>
> He says he needs to get back to Coatesville. He is not in Coatesville at that time. He is not hiding where he is. The Detective calls him two weeks later on the number that he gave. He answers the phone and, again, he talks to the Detective. There is no indication here that there were a series of phone calls that weren't returned, that there were attempts or hang-ups or that they had to track down other numbers. I want to come in and talk to you. And he is doing what the logical thing would be, I submit to

14

R14

you, hoping to get money for an attorney to help him because he believes there may be some accusations that are going to be filed against him.

(N.T. 10/9/2013, 125-26). Defendant never stated he did not want to speak with Detective Dowds and in fact, initially contacted Detective Dowds and gave him his phone number.

Defendant cites the case of Commonwealth v. Molina, 628 Pa. 465, 104 A.3d 430 (2014) in support of his argument. Molina is distinguishable from the case at bar. While the defendant in Molina spoke with a detective over the phone, when the detective asked the defendant to come to the police station to tell his side of the story, he refused to cooperate or speak further with the detective. The Supreme Court determined that when the defendant refused to speak further with the detective, he invoked his right against self-incrimination, thereby prohibiting the use of his pre-arrest silence as substantive evidence of guilt. Molina, at 500, 104 A.3d at 451.

At bar, Defendant initially contacted Detective Dowds and told Detective Dowds he wanted to speak with him as soon as he returned to Coatesville. Defendant never refused to speak with Detective Dowds at any point prior to his arrest. Any questioning by Detective Dowds regarding Defendant's conduct prior to his arrest supports counsel's reasonable trial strategy that Defendant cooperated with law enforcement and continually told police he did not rape the victim.

III. Expert Testimony from Lay Witnesses:

Defendant argues that counsel was ineffective for failing to object to the expert testimony provided by two lay witnesses. Specifically, Defendant contends that SAFE nurse Marvin Jackson provided expert testimony regarding lack of injuries to rape victims and Detective Dowds provided expert testimony regarding information available in cell phone

15

R15

records. Defendant argues that these witnesses were not qualified as experts and their testimony constituted hearsay and was beyond the scope of an ordinary lay person's knowledge. Defendant concludes that but for counsel's failure to object to this testimony, the outcome would have been different.

Pa.R.E. 701 provides as follows:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) Rationally based on the witness's perception;

(b) Helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) Not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 702 addresses testimony by an expert witness.

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

The Commonwealth presented the testimony of Marvin Jackson, a registered nurse at Lancaster General Hospital, who examined the victim the night of the assault. Mr. Jackson is a qualified Sexual Assault Forensic Examiner (SAFE) nurse. (N.T. 10/9/2013, 5). Mr. Jackson performed a Sexual Assault Forensic Exam on the victim on August 5, 2012. (N.T. 10/9/2013, 8-9). Mr. Jackson testified as follows with regard to injuries to the victim:

16

R16

Q: When you conducted the pelvic exam of Ms. Hines---

A: Yes.

Q: Did you observe any injuries to her pelvic or rectal area?

A: There was—let me double check. There was some redness to the cervix and I saw a white substance there.

...

Q: On the body map of the genital area, do you note on there any injury or do you note anything indicating an absence of injury?

A: On the body map, yes. And on the genital injury documentation I did not put any injuries down.

Q: In fact, you stated no obvious injury?

A: Correct.

Q: But your recollection now on the checklist is you do mention there was some redness to the cervix or does your checklist just mention the white substance?

A: The white substance.

Q: What, if anything, does the lack of obvious injury to the genital area tell you about whether or not a sexual assault occurred?

A: It does not say one way or the other.

Q: Can you explain that to the jury.

A: Lot of times there will be no injury to the genital area, because, unlike, I guess, I don't want to say typical, but the idea that there is a lot of bruising just doesn't happen. A lot of times the patient will have been threatened with further bodily harm, so they will, to avoid further injury, they will not resist, not put up a fight. And there have been studies that where, between nonconsensual and consensual sex, usually the nonconsensual sex won't have injuries in 80 to 90 percent of the cases.

Q: Now, you mentioned in many cases the victim will be threatened and will not—I forget your exact words. Did Ms. Hines

R17

indicate in her conversation with you whether or not she had been threatened at all?

A: She was. She told me that he threatened to kill her with a box cutter if she did not comply.

(N.T. 10/9/2013, 21-24).

Defendant has failed to prove that but for counsel's failure to object to this line of questioning, the outcome would have been different. If counsel had objected to Mr. Jackson's testimony, the Commonwealth would have qualified Mr. Jackson as an expert. Mr. Jackson testified that he has been a registered nurse for 28 years and has worked at Lancaster General Hospital as a registered nurse in the emergency room for the past 8 years. (N.T. 10/9/2013, 4-5). Mr. Jackson's duties include trauma nursing and being a SAFE nurse. (N.T. 10/9/2013, 5). Mr. Jackson received 60 hours of adult and pediatric training in order to become a SAFE nurse. (N.T. 10/9/2013, 6). Mr. Jackson testified that he has been a SAFE nurse for the past 2 years and has conducted 15 sexual assault forensic exams on adults. (N.T. 10/9/2013, 7-8). Once qualified as an expert, Mr. Jackson would be permitted to give this testimony. *See*, Commonwealth v. Minerd, 562 Pa. 46, 753 A.2d 225 (2000) (Commonwealth may offer, as part of its case-in-chief in a sexual assault prosecution, an expert's testimony that absence of physical trauma is consistent with alleged sexual abuse).

Defendant further argues that trial counsel was ineffective for failing to object when Detective Dowds testified that cell phone records would not show whether a cell phone was operating or dead. Defendant contends that Detective Dowds was testifying as a lay witness and did not have the specified skill, training or expertise to testify regarding cell phone usage and cell phone records. Defendant argues that trial counsel's failure to object prejudiced him.

18

R18

Defendant informed Detective Dowds during his interview that the victim's cell phone was ringing while they were together. (Exhibit C-96A, p.5; 7; 16). The victim testified that she realized her cell phone was dead when she went to look at it while she and Defendant were outside of the Kool Bar smoking marijuana. (N.T. 10/9/2013, 69-70). Defendant argues that trial counsel should have objected when Detective Dowds testified as follows on re-direct exam:

> Q: Detective, you were asked questions as to whether or not you received—attempted to obtain phone records, correct?
>
> A: Correct.
>
> Q: Would a phone record of any kind be able to confirm or corroborate one way or the other whether a cell phone was dead at any given time?
>
> A: No, it would not.
>
> MS. CARDAMONE: I have nothing further.
>
> THE COURT: Thank you. Any follow-up?
>
> ---RECROSS EXAMINATION---
>
> BY MS. KEMPS:
>
> Q: Phone records will tell you, however, if a phone call was made and whether they were received and how long the calls were made, correct?
>
> A: Correct.

(N.T. 10/9/2013, 106-07).

Defendant fails to provide evidence that Detective Dowds' testimony was prejudicial. Defendant failed to provide evidence that the cell phone had power and was working during the assault. Defendant makes only the bald assertion that the victim's cell phone was working during the assault. Defendant cannot be prejudiced by Detective Dowds' testimony

19

R19

unless he can provide evidence that the victim's cell phone was working and Detective Dowds' testimony was false. Even if Defendant provided this evidence, whether or not the victim's cell phone was working during the assault does not disprove the fact that the victim was raped.

Even if Defendant could prove that the victim's cell phone had power during the assault, there is no evidence of record that the victim could have reached her phone and called for help. The jury heard Defendant's statement that he heard the victim's cellphone ringing while they were together and the victim's testimony that her cell phone was dead. The victim testified that when Defendant started choking her, she remembered she had a can of mace in her purse, but her purse was so big and out of her reach, she would not be able to get to it and remove the mace. (N.T. 10/9/2013, 106-107). The jury further heard the victim's testimony that she was afraid that Defendant would kill her if she screamed for help. (N.T. 10/9/2013, 91). If the victim was so afraid that she could not scream for help, it is unbelievable that she could reach for her cell phone and call for help. Issues regarding a witness's credibility are left to the fact finder, who is free to believe all, part or none of the witness's testimony. Commonwealth v. Pirela, 398 Pa.Super. 76, 82, 580 A.2d 848, 852 (1990), appeal denied, 527 Pa. 672, 594 A.2d 658 (1991).

IV. Flight Instruction:

Defendant alleges that trial counsel was ineffective for failing to object to a flight instruction being given to the jury. Defendant argues that he did not flee the jurisdiction. Defendant contends that he spoke with Detective Dowds over the phone and Detective Dowds knew his phone number as well as his address. Therefore, Defendant concludes that there was no evidence of record that would support a flight instruction.

20

"[W]here evidence exists that a defendant committed a crime, knew he was wanted, and fled or concealed himself, such evidence is admissible to establish consciousness of guilt." Commonwealth v. Lukowich, 875 A.2d 1169, 1173 (Pa.Super. 2005), *citing*, Commonwealth v. Johnson, 576 Pa. 23, 838 A.2d 663, 681 (2003). In determining whether a jury charge was properly given, the court examines the charge as a whole. Lukowich, at 1174. The trial court is given broad discretion in fashioning jury instructions, as long as the law is presented in a clear, adequate and accurate manner. *Id*.

At bar, there is evidence of record that Defendant knew that the victim was accusing him of committing a crime and as soon as he heard that, he left Coatesville. Defendant told Detective Dowds during his interview on November 19, 2012 that the day after he had consensual sexual contact with the victim, he and his friend returned to the Kool Bar, where Defendant overheard another individual state that his sister had been raped the night before in the park. (Exhibit C-96A, at 5-6). Defendant also told Detective Dowds that a week after the incident occurred he overheard a phone conversation between his girlfriend, Ashley Harris, and a male wherein the male caller informed his girlfriend that Defendant had raped his sister in the park. (Exhibit C-96A, at 10-11; N.T. 10/9/2013 at 104). Detective Dowds further testified that Ashley Harris informed him the Defendant was living with her in Coatesville until he heard about the rape allegation. (N.T. 10/9/203, 104; Exhibit C-95, p.14 of 15). When Detective Dowds spoke with Defendant on September 10, 2012, Defendant told him that Ashley Harris told him there was a warrant out for his arrest. (N.T. 10/9/2013, 106; Exhibit C-95, p. 12 of 15). Defendant did not come to Coatesville and speak with Detective Dowds until he was arrested 2 months later. (N.T. 10/9/2013, 106).

21

Based upon this evidence, the following instruction was given to the jury:

> There was evidence in this case that tended to show that the defendant moved out of Coatesville shortly after he became aware of the victim's complaint to the police. The credibility, weight, and effect of this evidence is solely for you to decide. Generally speaking, when a crime has been committed and the person thinks he is or may be accused of committing it and he flees or conceals himself, such flight or concealment is a circumstance tending to prove the person is conscious of guilt. Such flight or concealment does not necessarily show consciousness of guilt in every case.

> A person may flee or hide for some other motive and may do so even though innocent. Whether the evidence of flight or concealment in the case should be looked at as tending to prove guilt depends on the facts and circumstances of this case and especially on motives that may have prompted the flight or concealment. You may not find the defendant guilty solely on the basis of evidence of flight or concealment.

(N.T. 10/9/2013, 160-61). The instant instruction advised the jury they could consider evidence of consciousness of guilt but that it was not required to do so. The instruction further advised that the jury could not find Defendant guilty based solely on the basis of flight or concealment.

The instruction was clear, adequate and legally accurate. The charge was based upon the fact that Defendant fled the jurisdiction as soon as he heard the allegations of rape. As of September 10, 2012, Defendant knew there was a warrant out for his arrest, but did not return to Coatesville until November, despite telling Detective Dowds he would return in October. Therefore, the Court's instruction was proper and any objection by the Defendant would have been meritless.

V. Violation of Mandatory Discovery:

Defendant argues that trial counsel was ineffective for failing to request a mistrial when Detective Dowds testified about a police report that was never disclosed to Defendant. Specifically, Detective Dowds testified that he met with the victim while they walked through

22

R22

Ash Park, the location of the assault, and the information he received during that meeting was placed into a police report that was not disclosed to Defendant. Defendant contends that this report was "presumably exculpatory because it provided additional information about the complainant's version of the incident, the location as well as the crime scene." (Defendant's Initial Memorandum of Law in Support of Petition for Post-Conviction Collateral Relief, p. 19). Defendant argues that a failure to provide this report is a violation under Brady v. Maryland, 373 U.S. 83 (1963).

In order for Defendant to be successful on his claims under the PCRA, he must plead and prove by a preponderance of evidence that the conviction or sentence resulted from one or more of the seven enumerated error listed in 42 Pa.C.S.A. § 9543(a)(2). Defendant's allegation of a Brady violation falls within the following errors:

> (i) A violation of the Constitution of this Commonwealth or the constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.
>
> (ii) Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth determining process that no reliable adjudication of guilt or innocence could have taken place.

42 Pa.C.S.A. § 9543(a)(2)(i, ii).

Pa.R.Crim.P. 573(B)(1) provides in pertinent part that the Commonwealth shall disclose to the defendant all of the following requested items or information, provided they are material to the instant case:

> (a) Any evidence favorable to the accused that is material either to guilt or to punishment and is within the possession or control of the attorney for the Commonwealth;

(b) any written confession or inculpatory statement, and the identity of the person to whom the confession or inculpatory statement was made that is in the possession or control of the attorney for the Commonwealth;

(c) the defendant's prior criminal record;

(d) the circumstances and result of any identification of the defendant by voice, photograph, or in-person identification;

(e) any result or reports of scientific tests, expert opinions, and written or recorded reports of polygraph examinations or other physical or mental examinations of the defendant that are within the possession or control of the attorney for the Commonwealth;

(f) any tangible objects, including documents, photographs, fingerprints, or other tangible evidence; and

(g) the transcripts and recordings of any electronic surveillance, and the authority by which the said transcripts and recording were obtained.

To establish a Brady violation, the following three elements must be proven:

(1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued.

Commonwealth v. Roney, 622 Pa. 1, 22, 79 A.3d 595, 607 (2013), *citing*, Commonwealth v. Hutchinson, 611 Pa. 280, 25 a.3d 277, 310(2011).

The evidence at issue must have been "material evidence that deprived the defendant of a fair trial." *Id*. (citation and emphasis omitted). "Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Commonwealth v. Paddy, 609 Pa. 272, 15 A.3d 431, 450 (2011) (quoting Kyles v. Whitley, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).

Roney, at 22-23, 79 A.3d at 607.

24

On cross-examination, Detective Dowds identified photos of Ash Park he took while he was walking through Ash Park with the victim. (N.T. 10/8/2013, 43). Detective Dowds testified that he did not recall the exact date that he walked through Ash Park with the victim; however, it was after he interviewed the victim the first time. (N.T. 10/8/2013, 44). Detective Dowds further testified as follows:

> Q: And you are the investing {sic} officer in the case, correct?
>
> A: I am.
>
> Q: In your police report, did you provide any indication that you had met with her and gone through the park after you interviewed her?
>
> A: I believe I did.
>
> Q: So you believe that that is there?
>
> A: Yes.

(N.T. 10/13/2013, 44).

Defendant has failed to plead and prove by a preponderance of evidence that because of trial counsel's failure to object to not receiving this police report, no reliable adjudication of guilt or innocence could have taken place. Although the Commonwealth had no duty to do so, the Commonwealth contacted Detective Dowds, who provided a Supplemental Narrative dated February 26, 2013, which was promptly presented to counsel for Defendant. (Commonwealth's Motion to Quash Subpoena, Exhibit B). The February 26, 2013 Supplemental Narrative contains facts almost identical to those testified to at trial by the victim. The Supplemental Narrative did not offer any exculpatory evidence or provide evidence to allow Defendant to impeach the victim's testimony. Defendant could have easily impeached the

25

R25

victim's testimony using the August 10, 2012 Supplemental Narrative found at Commonwealth's Exhibit C-95.

Defendant has failed to prove that the result of the proceedings would have been different if this Supplemental Report had been available to Defendant. This Supplemental Report provided additional, consistent evidence to allow the Commonwealth to prove that Defendant sexually assaulted the victim. Defendant failed to show how this report was material to his defense, how it was exculpatory or how the outcome would have been different if he had this report. Absent this evidence, Defendant's claim must fail.

VI. Failing to Properly Investigate:

Finally, Defendant argues that trial counsel was ineffective for failing to conduct a proper investigation and obtain video surveillance of the Kool Bar on the night of the sexual assault as well as cell phone records that would refute the victim's testimony that her cell phone was dead that night. Defendant contends that the video surveillance and the phone records "could have" provided additional evidence to corroborate the defense and further contradict the testimony of the victim. Defendant argues failure to obtain this evidence deprived him of a fair trial.

Again, Defendant has failed to plead and prove by a preponderance of evidence that ineffective assistance of counsel so undermined the truth determining process that no reliable adjudication of guilt or innocence could have taken place. Defendant has failed to produce either video surveillance from the Kool Bar or the victim's cell phone records. Defendant simply makes the bald assertion that the video surveillance and the cell phone records "could have" provided additional evidence favorable to his defense. Defendant failed to show a reasonable probability that the outcome of the trial would have been different if counsel had

26

R2b

discovered video surveillance from the Kook Bar and the victim's cell phone records. Absent this evidence, Defendant cannot prove that this claim has merit or that he was prejudiced by trial counsel's conduct.

Accordingly, we enter the following:

## ORDER

AND NOW, this 25th day of May, 2018, upon consideration of Defendant's Motion for Post-Conviction Collateral Relief pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541, *et seq.*, it is ORDERED and DECREED that the petition is DENIED and DISMISSED. Defendant has the right to appeal from this Order by filing a Notice of Appeal with the Superior Court within 30 days of the entry of this Order.

BY THE COURT:

Jacqueline C. Cody _____
P.J.

27

R27